*Receipt # 55938  5/17/04*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN EXPRESS FINANCIAL ADVISORS, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>MARY R. DeGON AND MATTHEW M. BRUCE, )<br><br>Defendants. ) | Civil Action No. _____<br><br>**04 - 10979 RGS**<br><br>MAGISTRATE JUDGE *Cohen* |

## COMPLAINT

Plaintiff American Express Financial Advisors, Inc. ("AEFA" or "American Express"), for its

Complaint against Defendants Mary R. DeGon ("DeGon") and Matthew M. Bruce ("Bruce")

(collectively referred to as "Defendants"), complains and alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has personal jurisdiction over Defendant DeGon in that DeGon resides in

Marshfield, Massachusetts, and does business in Pembroke, Massachusetts, and the surrounding area.

Venue also is proper in this Court because of DeGon's residence and business activities in and around

this District.

2.     This Court has personal jurisdiction over Defendant Bruce in that Bruce resides in

Bournedale, Massachusetts and does business in Pembroke, Massachusetts and the surrounding area.

Venue also is proper in this Court because of Bruce's residence and business activities in this District.

3.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332, by

reason of the diversity of citizenship of the parties and that, without the granting of injunctive relief,

American Express will suffer irreparable harm and damages in an amount in excess of $75,000,

exclusive of interest and costs. Plaintiff AEFA is a Delaware corporation with its principal place of

business in Minneapolis, Minnesota. This Court further has jurisdiction pursuant to 28 U.S.C. § 1331

and § 1338 and 15 U.S.C. § 1121 because portions of this action arise under the Trademark Act of 1946

as amended, 15 U.S.C. § 1051, *et seq.* (also referred to herein as the "Lanham Act"), and the Computer

Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

## PARTIES

4.    Plaintiff AEFA provides a variety of financial services to persons and entities nationwide

(AEFA formerly was named IDS Financial Services Inc.). AEFA is a subsidiary of American Express

Financial Corporation, a Delaware corporation with its principal place of business in Minneapolis,

Minnesota.

5.    Defendant DeGon was a financial advisor with American Express from on or about

December 15, 1987, until her resignation, without notice, on May 3, 2004, working most recently out of

American Express' Pembroke office.

6.    Defendant Bruce was a financial advisor with American Express from on or about

October 22, 1996, until his resignation, without notice, on May 3, 2004, working most recently out of

American Express' Pembroke office.

## SUMMARY OF FACTUAL ALLEGATIONS

7.    DeGon became sponsored by American Express on or about December 15, 1987, and

subsequently was appointed as an advisor on or about February 10, 1988. As a result of American

Express' training and ongoing support, DeGon became a successful American Express financial advisor,

having three hundred and five (305) American Express client groups assigned to her and earning in

excess of $180,000 for the year 2003.

8.      Bruce became sponsored by American Express on or about October 22, 1996, and subsequently was appointed as an advisor on or about March 12, 1997.  As a result of American Express' training and ongoing support, Bruce became a successful American Express financial advisor, having eighty-seven (87) American Express client groups assigned to him and earning in excess of $92,000 for the year 2003.

9.      DeGon and Bruce worked together in American Express' Pembroke office and were the only two financial advisors in that office.  On May 3, 2004, DeGon and Bruce each submitted a written resignation, that had been back dated to April 5, 2004, indicating that they had resigned as of April 19, 2004.

10.     On information and belief, before submitting their resignations, DeGon and Bruce had been planning to terminate their relationships with American Express in order to go into direct competition with American Express.  In furtherance of this plan, DeGon and Bruce each had been in contact with American Express' clients, informing those clients of their intended plans.

11.     To date, DeGon and Bruce have retained and misappropriated confidential client records and other confidential client information in conjunction with the termination of their affiliation with American Express.

12.     To date, DeGon and Bruce continue to use the same telephone and facsimile numbers that they used while associated with American Express and have not changed the telephone number, or disconnected it, as required by their contracts with American Express.  This number is listed in telephone directories under American Express' name, and persons calling this number expecting to reach American Express will instead reach Defendants.

13.    To date, DeGon and Bruce continue to use American Express signs in affiliation with their business and have not removed the signs that indicate an affiliation with American Express as required by their contracts.

14.    Upon information and belief, DeGon and Bruce have converted and attempted to convert many American Express client accounts, have misappropriated many client files and records, and have damaged many relationships between American Express and its clients. There remain, however, many client relationships they have not yet destroyed and millions of dollars of client assets they have not yet diverted.

15.    These and other actions by DeGon and Bruce against American Express, which are described in more detail below, violate the contracts that DeGon and Bruce entered into with American Express. These actions also constitute violations of the Lanham Act, breaches of their fiduciary duty to American Express, misappropriations of American Express' trade secrets, and other tortious conduct against American Express.

## DeGon's Relationship with American Express

16.    Before joining American Express, DeGon had no experience working in the financial services industry. DeGon had worked as a technical customer support specialist and a service manager for AT&T Information Services, but had been unemployed for several months prior to joining American Express.

17.    Upon DeGon's appointment as an advisor with American Express, on or about February 10, 1988, and as a condition of her employment, training and continuing relationship with American Express, DeGon signed the Personal Financial Planner's Agreements that controlled the terms of her relationship with American Express.

4

18.    In reliance on DeGon's initial promises in such Agreements, American Express trained her at significant expense. When DeGon joined American Express, she was enrolled in American Express' comprehensive training program, which included a two week session at American Express' training facility at Chaska, Minnesota. Thereafter, DeGon also was assigned to work under the supervision of an experienced American Express Personal Financial Advisor. This training enabled DeGon to become an American Express financial advisor.

19.    For approximately her first year with American Express, after completing the training provided by American Express, and receiving the appropriate licensing with American Express' assistance, DeGon was an American Express employee, receiving a salary and expense allowance to support her while she learned the business and built a client base to work with for American Express. After her first year, DeGon became an independent contractor affiliated with American Express.

20.    On or about December 21, 1999, DeGon transformed her affiliation with American Express from that of independent contractor to a franchisee when she executed the American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement ("DeGon Franchise Agreement"). Under the terms of the Franchise Agreement, a copy of which is attached as Exhibit A, DeGon was entitled to establish and operate an Independent Financial Advisor Business for AEFA. The Franchise Agreement contained a three (3) year term, subject to automatic renewal upon the satisfaction of certain designated conditions. In addition, the DeGon Franchise Agreement required DeGon, upon termination of her affiliation with American Express, to return confidential and proprietary business records, including the records of the clients she served on behalf of American Express, and to refrain, for a one-year period after her termination, from soliciting and diverting investment and insurance business of American Express clients with whom she had worked or learned of while associated with American Express. These obligations upon termination of her relationship with American Express are

5

significantly identical to prior obligations DeGon had agreed to with American Express. A true and correct copy of the signature page of DeGon's Franchise Agreement is attached as Ex. B.

21.     The DeGon Franchise Agreement also contained an Addendum 3-R (Rollout) Restrictive Covenant Addendum ("DeGon Addendum 3-R"), which DeGon also executed on December 21, 1999. According to the DeGon Addendum 3-R, American Express specifically agreed to forbear from the enforcement of certain of its designated rights under the Franchise Agreement if DeGon satisfied certain conditions at the termination of her affiliation. A true and correct copy of DeGon's Addendum 3-R is attached as Ex. C.

22.     After DeGon became an American Express financial advisor, American Express assisted her in developing and expanding her practice by providing her with American Express client accounts, client referrals and reassignments of American Express client accounts.

23.     American Express also made available to DeGon ongoing training and education, at American Express' expense, in investment planning methods and procedures and new and more sophisticated investment techniques.

24.     American Express also authorized DeGon to use the AEFA and American Express trade names, marks, and logos. In the financial services field, name recognition and identification with a strong, stable and well-known company have great importance and value.

25.     American Express provided DeGon with sales, research, and promotional support through American Express' network of financial professionals.

26.     By virtue of her affiliation with American Express, DeGon also gained access to American Express' confidential books and records, including the identity, addresses, and account information of numerous American Express clients whose accounts she was assigned.

6

27.     Through her affiliation with American Express as an American Express financial advisor, DeGon worked one-on-one with American Express clients and was encouraged by American Express, as part of American Express' long-term strategy, to build valuable and lasting financial planning relationships with American Express clients.

28.     As a result of the foregoing, and as a result of DeGon's efforts for which American Express paid her, DeGon became a successful financial advisor.

29.     As of March 31, 2004, DeGon had account responsibility for approximately three hundred and five (305) American Express client groups, representing approximately $38.7 million dollars of assets invested through American Express.

30.     The client accounts assigned to DeGon by American Express generated gross commissions, bonuses, and other compensation to her of more than $180,000 in 2003.

### Bruce's Relationship with American Express

31.     Before joining American Express, Bruce had no experience working in the financial services industry.  Most recently, Bruce had owned his own business before joining American Express.

32.     Bruce received a conditional offer of employment on or about October 22, 1996, and became sponsored by American Express for his licensure.  Upon Bruce's appointment as an advisor on or about March 12, 1997, and as a condition of his employment, training and continuing relationship with American Express, Bruce signed the Personal Financial Planner's Agreements that controlled the terms of his relationship with American Express.

33.     In reliance on Bruce's promises in such Agreements, American Express trained him at significant expense.  When Bruce joined American Express, he was enrolled in American Express' comprehensive training program, which included a two-week session at its training facility at Chaska, Minnesota.

34.    On or about May 29, 1997, American Express assigned Bruce to work under the supervision DeGon, an experienced American Express Personal Financial Advisor. This training enabled Bruce to become an American Express financial advisor.

35.    At the commencement of his appointment with American Express, after completing the training provided by American Express and receiving the appropriate licensing with American Express' assistance, Bruce was an employee, receiving a salary and expense allowance to support him while he learned the business and built a client base to work with for American Express.

36.    After completing his training period, Bruce's relationship with American Express changed from that of employee to independent contractor. The Personal Financial Planner's Agreements controlled the terms of Bruce's independent contractor relationship with American Express.

37.    On or about December 20, 1999, Bruce transformed his affiliation with American Express from that of independent contractor to a franchisee when he executed the American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement ("Bruce Franchise Agreement"). Under the terms of the Franchise Agreement, Bruce was entitled to establish and operate an Independent Financial Advisor Business for AEFA. The Franchise Agreement contained a three (3) year term, subject to automatic renewal upon the satisfaction of certain designated conditions.

38.    The Franchise Agreement further set forth the obligations required of Bruce upon termination of his affiliation with American Express, which included the return of confidential and proprietary business records, including the records of the clients he served on behalf of American Express, and to refrain, for a one-year period after his termination, from soliciting and diverting investment and insurance business of American Express clients with whom he had worked or learned of while associated with American Express. These obligations upon termination of his relationship with American Express are significantly identical to prior obligations Bruce had agreed to with American

8

Express. A true and correct copy of the signature page of Bruce's Franchise Agreement is attached as Ex. D.

39.    The Bruce Franchise Agreement further contained an Addendum 3-R Restrictive Covenant Addendum ("Bruce Addendum 3-R"), which Bruce also executed on or about December 20, 1999. According to the Bruce Addendum 3-R, American Express specifically agreed, upon Bruce's termination, to forbear from the enforcement of certain of its designated rights under the Franchise Agreement if Bruce satisfied certain conditions. A true and correct copy of Bruce's Addendum 3-R is attached as Ex. E.

40.    Throughout their affiliation, American Express assisted Bruce in developing and expanding his practice by providing him with American Express client accounts, client referrals and reassignments of American Express client accounts.

41.    American Express also made available to Bruce ongoing training and education, at American Express' expense, in investment planning methods and procedures and new and more sophisticated investment techniques.

42.    American Express also authorized Bruce to use the AEFA and American Express trade names, marks, and logos – all strong identifying marks with a long association with financial services in Massachusetts. (AEFA, including its predecessor IDS, has been in business for more than a century.) In the financial services field, name recognition and identification with a strong, stable and well-known company have great importance and value.

43.    Bruce also received sales, research, and promotional support through American Express' network of financial professionals.

9

44.    By virtue of his affiliation with American Express, Bruce also gained access to American Express' confidential books and records, including the identity, addresses, and account information of numerous American Express clients whose accounts he was assigned.

45.    Through his affiliation with American Express as an American Express financial advisor, Bruce worked one-on-one with American Express clients and was encouraged by American Express, as part of American Express' long-term strategy, to build valuable and lasting financial planning relationships with American Express clients.

46.    As a result of the foregoing, and as a result of Bruce's efforts for which American Express paid him, Bruce became a successful financial advisor.

47.    On or about March 22, 2000, in conjunction with American Express' launch of its franchise program, Bruce and DeGon entered into a business relationship named "DeGon and Bruce, a Financial Advisory Branch of American Express Financial Advisors."

48.    As of March 31, 2004, Bruce had account responsibility for approximately eighty-seven (87) American Express client groups, representing more than $7.7 million dollars of assets invested through American Express.

49.    The client accounts assigned to Bruce by American Express generated gross commissions, bonuses, and other compensation to him of more than $92,000 in 2003.

## American Express' Franchise Agreement and Addendum 3-R

50.    The Franchise Agreement and Addendum 3-R, executed by both DeGon and Bruce, are designed to protect American Express' reasonable expectations in the continued confidentiality of their client information, client goodwill, and client relationships, all of which American Express entrusted to DeGon and Bruce. The contracts also protect American Express' clients from violations of their privacy, from the misuse of their confidential financial information, and from unjustified churning of

10

their accounts by former representatives, insofar as they prevent a representative from abusing his or her position of trust by encouraging clients to liquidate their American Express investments and insurance policies simply because he or she may wish to leave American Express. The contracts clearly set forth the expectations and conditions that must be followed upon the termination of their affiliation with American Express.

51.    American Express explicitly sets forth the protections of its Confidential Information in Section 10 of the Franchise Agreement, stating:

> 10.    CONFIDENTIAL INFORMATION. Independent Advisor has had and/or may have access to AEFA trade secrets and confidential information that Independent Advisor agrees has great value to AEFA. Independent Advisor agrees that because of such access, Independent Advisor is in a position of trust and confidence with respect to this information. To protect client confidentiality, AEFA goodwill, trade secrets, and other proprietary and confidential business information, Independent Advisor agrees to not, during the term of this Agreement or thereafter, except as permitted under Section 14 regarding transfers of the Independent Financial Advisor Business, communicate, divulge, or use for himself or herself except pursuant to the System, or for the benefit of any other person, partnership, association, or corporation any confidential information, or trade secrets, including, without limitation, Client names, addresses and data and know-how concerning the methods of operation of the System and the business franchised under which may be communicated to Independent Advisor or of which Independent Advisor may be apprised by virtue of Independent Advisor's operation under the terms of this Agreement. Independent Advisor also shall not reveal any information about potential clients to whom a presentation has been made by any Independent Advisor who might reasonably be expected to do business with AEFA. Independent Advisor agrees to divulge such confidential information only to such of his or her employees as must have access to it in order to operate the Independent Financial Advisor Business. Except as otherwise permitted in Section 19, Independent Advisor agrees that, without limitation, Client names, addresses, data and other personal and financial information recorded in Client records are confidential. Confidential information includes compilations and lists of such Client information even if of otherwise public information if such compilations or lists were the result of substantial effort, time and/or money expended pursuant to the System. Independent Advisor further agrees to use this confidential information only in furtherance of this Agreement or in accordance with the Manuals and for no other purpose. Confidential information does not include information which is generally known outside of AEFA other than as a result of a disclosure by Independent Advisor, Independent Advisor's agents or representatives, or any other person or entity in breach of any

11

contractual, legal or fiduciary obligation of confidentiality to AEFA or to any other person or entity with respect to such information.

52.    American Express also enters into post-affiliation restrictive covenants, as set forth in

Section 19, with its financial advisors:

19.    <u>COVENANTS.</u> . . . .

•    Independent Advisor specifically acknowledges that, pursuant to this Agreement, Independent Advisor will receive additional substantive rights as a franchisee of AEFA.  Independent Advisor also recognizes he or she will receive valuable and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of AEFA and the System.  In recognition of and in consideration for these and other benefits, to protect the confidentiality of AEFA's Client information and to protect AEFA's goodwill, Independent Advisor covenants that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within which Independent Advisor operates or operated, Independent Advisor agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

a.    (1)    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate an agreement with AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System;

(2)    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate, surrender, redeem, or cancel any action related to Products & Services acquired or ordered from or through AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System, except as provided in the Manuals or with AEFA's written approval and consent;

(3)    Solicit any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement to open an account other than an AEFA account or to sell any investment, financial or insurance products or services other than through AEFA with AEFA's written approval and consent; or

(4)    Open an account for, or provide or offer to provide any investment, financial, or insurance products or services to any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement;

b.        (1)    Employ, or retain as an independent contractor, any person who is at that time employed by AEFA or associated with AEFA as an independent contractor or agent or by any other Independent Advisor of AEFA, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with AEFA; or

(2)    Disparage AEFA, its affiliates, employees, advisors, and Products and Services.

For purposes of this Section, an "**Issuer**" is a company or entity that issues Products & Services distributed or offered by AEFA, AEFA's affiliates, or AEFA as the agent of another company.

• Independent Advisor understands and acknowledges that if Independent Advisor terminates this Agreement, AEFA shall have the right to continue to actively offer all Products and Services to Clients the Independent Advisor serviced at AEFA.

• Upon expiration of this Agreement, Independent Advisor may have a right to revenue based on past Products & Services that have been purchased by Clients through the Independent Financial Advisor Business, as provided for in the Manuals, or with AEFA's approval and consent.

• Independent Advisor understands and acknowledges that AEFA shall have the right, in its sole discretion, to reduce the scope or restrictiveness of any covenant set forth above, or any portion thereof, without Independent Advisor's consent, effective immediately upon receipt by Independent Advisor of written notice thereof; and Independent Advisor agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provides of Section 24 hereof. Independent Advisor agrees and understands that AEFA's exercise of such discretion, as to the Independent Advisor who is the subject of this Agreement, or of any other Independent Advisor, shall not constitute a waiver of any of AEFA's right to enforce this or any other agreements.

• Independent Advisor expressly agrees that the existence of any claims it may have against AEFA, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by AEFA of the covenants of this Section 19.

. . .

• Nothing in this Agreement will prevent Independent Advisor from engaging in a competitive business consistent with the covenants in this Section 19, including serving as a financial advisor or consultant affiliated with another firm, after this Agreement expires or is terminated. Nothing in this Agreement

will prohibit Independent Advisor from soliciting and servicing any Clients that Independent Advisor contacted, serviced or learned about while operating under and agreement with AEFA more than one year after this Agreement terminates or expires, provided that Independent Advisor makes no use directly or indirectly of any confidential or trade secret information, including but not limited to client files and lists obtained from AEFA.

- Upon Independent Advisor's request, AEFA may in its complete discretion release Independent Advisor from any provisions in this Section 19, in whole or in part, for example to exclude specified family members from the provisions in this Section 19. Such requests by Independent Advisor must be in writing and any release to Independent Advisor must be in writing and signed by an officer of AEFA. Any such release shall not act as a waiver of any of AEFA's rights under this Agreement as such rights apply to any other Independent Advisor.

- AEFA agrees that clients who Independent Advisor purchased a direct or indirect interest in or obtained outside of the AEFA System and transferred to AEFA are not subject to Section 19 (a)(1), (2), (3) and (4).

53.    In Section 18, the Franchise Agreement also sets certain obligations upon the financial advisors, including:

18.    <u>OBLIGATIONS UPON TERMINATION OR EXPIRATION</u>

Upon termination or expiration of this Agreement, all rights granted hereunder to Independent Advisor shall forthwith terminate although Independent Advisor's duties under this Agreement shall continue as specified in this Section 18, and:

- Independent Advisor agrees to immediate cease to operate the Independent Financial Advisor Business, and Independent Advisor agrees to not thereafter, direct or indirectly, represent to the public or hold himself or herself out as a present or former franchisee of AEFA.

- Independent Advisor agrees to immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the System; the Proprietary Marks; and the distinctive forms, slogans, signs, symbols, and devices associated with the System. In particular, Independent Advisor agrees to cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks.

- Independent Advisor agrees to immediately cease using any telephone number used by Independent Advisor in the Independent Financial Advisor Business. AEFA agrees to immediately cease using the telephone number unless

the telephone number is for an Area Office or other AEFA-leased space. At AEFA's expense, AEFA reserves the right to add a forwarding message to any such telephone number, indicating the telephone number for AEFA and for the departing Independent Advisor.

● Independent Advisor agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in AEFA's sole discretion, is likely to cause confusion, mistake, or deception, or which, in AEFA's sole discretion, is likely to dilute AEFA's rights in and to the Proprietary Marks. . . .

● Independent Advisor agrees to immediately deliver to AEFA the Manuals and all other original records, including most recent financial plans and recommendations, computer databases and files, correspondence, and instructions containing confidential information relating to the System (and any copies thereof, including electronic or computer generated copies, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of AEFA. To satisfy regulatory requirements, Independent Advisor agrees to immediately deliver to AEFA the originals of all Client records, including records containing Client lists and/or information and transactions belonging to AEFA, unless Independent Advisor transfers the Independent Financial Advisor Business as provided in Section 14.

● Independent Advisor agrees to immediately (i) discontinue use of any computer software developed for the System or AEFA, (ii) deliver to AEFA all such computer software in Independent Advisor's possession or control and any copies made of such computer software, (iii) erase or destroy any of such computer software contained in the computers or data storage devices under the control of Independent Advisor, and (iv) remove such computer software from any other computer programs or software in Independent Advisor's possession or control that incorporates or used such computer software in whole or in part.

● Independent Advisor agrees to comply with the covenants contained in Section 19 of this Agreement.

54.     The Franchise Agreement contains a Minnesota choice of law provision in Section 26.

55.     Finally, both DeGon and Bruce agreed in their respective Franchise Agreements, in Section 19, that American Express would be entitled to injunctive relief for any violation of the Franchise Agreement:

● Independent Advisor agrees that to the fullest extent permitted by applicable law, AEFA will be entitled to injunctive relief from a court or NASD

arbitration should Independent Advisor violate any of the covenants in this Section 19 and in Section 10 and 18 (the "Sections") of this Agreement. Independent Advisor recognizes that AEFA's remedies solely at law will be inadequate, that AEFA will be irreparably harmed by violations of the provisions in the Sections, and thus that AEFA will be entitled to injunctive relief to prevent future violations of the provision sin the Sections until a full and final resolution of any dispute may be had on the merits. If Independent Advisor has signed Addendum No. 3 but fails to comply with it, AEFA shall be entitled to immediate injunctive relief to enforce at AEFA's option, the covenants in Section 19, including 19(a)(1), (2), (3), and (4) and/or of Addendum 3. AEFA has the right to seek such injunctive relief in a court of competent jurisdiction, which relief shall extend until, and if, a decision on the merits of the same issue is rendered by an NASD arbitration panel. Such election by AEFA to see judicial relief shall not waive any rights AEFA may have to arbitrate disputes arising under this Agreement, including rights to obtain damages from Independent Advisor in arbitration for violations of this Agreement.

56.    Addendum 3-R provides that financial advisors can qualify to be released from certain of

the post-termination covenants (relating to soliciting and servicing clients) contained in the Franchise

Agreement upon the satisfaction of certain requirements set forth in Section C of Addendum 3-R:

C.    Terms of Forbearance Agreement.    As a mitigation of this irreparable harm, AEFA agrees to forbear from enforcement of its rights against Advisor under the Restrictive Covenant if Advisor timely and fully complies with the following conditions:

1.    Two Weeks' Notice. Advisor must provide AEFA with at least two-weeks' written notice of the termination of the Franchise Agreement ("Termination Notice"), with a copy to be delivered personally to the Advisor's Group Vice President ("GVP") designate, or if no designate is timely provided, to the Advisor's immediate AEFA leader, and, in either event, a copy, by facsimile or overnight mail, to AEFA Corporate Office, Licensing Unit.

2.    As of the date of the Termination Notice, the Advisor must:

(a)    Length of Service.    Have served at least six consecutive years as an advisor for AEFA.

(b)    Compliance Obligations.    Not be subject to discipline as a result of a violation of the Compliance Rules as defined in Section 3 of the Franchise Agreement ("Compliance Rules"). This discipline may include, but not be limited to, suspension, strict supervision, involuntary termination or otherwise "permitted to resign".

3.    Return of Complete Files and Proprietary Materials. Within five (5) business days after the date of the Termination Notice (including the date of such Notice), Advisor must return all original client files and AEFA proprietary materials, as defined in the Franchise Agreement, to the Advisor's GVP designate or, if no designation is provided by AEFA within five (5) business days, to the Advisor's immediate AEFA leader.

To the extent consistent with privacy laws and policies, in order to allow Advisor to service portable products and to fulfill compliance duties, Advisor may retain copies of consolidated statements, financial plans, tax returns, advisor notes, insurance policies, AEFA or AEFA approved product applications and trust or other legal documents for the clients Advisor serviced at AEFA, but may not retain copies of any AEFA/American Express Company proprietary materials, or AEFA/American Express Company trademarked, or copyrighted materials, software or property, as defined in the Franchise Agreement.

4.    Franchise Agreement Compliance. On and before the effective date of termination of the Franchise Agreement between AEFA and Advisor, Advisor shall comply fully with Section 18 (Obligations upon Termination or Expiration) of the Franchise Agreement.

57.    While not imposing undue hardship on either DeGon or Bruce, the covenants summarized above protect American Express' legitimate interests in their proprietary marks and information. These covenants also preserve American Express' interests in their long-term relationships with clients and client goodwill by protecting American Express from the deflection of clients by former agents by means of the opportunities which American Express gave them while allowing their former agents the opportunity to compete upon satisfying certain minimal obligations. American Express pays their agents to work hard for the American Express clients assigned to them and to develop good relationships with those clients. The agents thus embody American Express' client goodwill and would have an unfair competitive advantage if permitted to use that goodwill against American Express.

58.    The covenants in the Franchise Agreement also protect American Express' clients' privacy, which American Express has promised to preserve. The covenants provide American Express with the means of ensuring that agents preserve the confidentiality of American Express client information.

17

## DeGon's and Bruce's Violations of Their
## Franchise Agreements and Acts of Unfair Competition

59.    Effective May 3, 2004, both DeGon and Bruce submitted letters terminating their affiliation with American Express. However, each had back-dated their letters to April 5, 2004, and stated the effective date of their terminations would be April 19, 2004.

60.    On information and belief, before leaving American Express, DeGon and Bruce had been communicating with certain American Express clients and soliciting them to modify or close their American Express accounts so that DeGon and Bruce could easily move their investments to a new venture. These actions violated their contractual duties to American Express.

61.    After terminating their affiliation with American Express, Defendants continue to display signs at their office indicating their affiliation with American Express.

62.    Defendants have retained the telephone and facsimile numbers used by them when they worked for American Express. Upon information and belief, until May 6, 2004, Defendants continued to indicate on their voicemail that they were affiliated with American Express. On further information and belief, Defendants are retaining this number to assist in their ongoing efforts to divert American Express customers to Defendants' new venture.

63.    In their positions as financial advisors at American Express, DeGon and Bruce had access to hundreds of American Express' client files. These files are American Express' property and contain American Express' confidential information. These files also contain confidential client information which American Express clients have entrusted to American Express and which American Express promised to protect. While DeGon and Bruce were entitled to use these client records to perform their duties as an American Express financial advisor, they had no authorization or right to retain such records or copies of such records for personal use and were specifically required by their Franchise Agreements

18

to return such records and copies thereof to American Express upon terminating their affiliation with American Express.

64.    As part of their scheme to divert American Express clients and their investments from American Express, Defendants wrongfully and without authorization have retained and refused to return any of the files and records of American Express' clients, including copies of various confidential lists of the American Express clients assigned to them. These lists include client names, addresses, telephone numbers, and all investments currently in each client's account.

65.    When Defendants kept the American Express client records, they knew that American Express would be at a significant disadvantage in its ability to continue servicing the affected clients and that their actions would sabotage American Express' relationships with those clients.

66.    DeGon and Bruce retained these confidential and proprietary American Express documents to be in a better position to solicit these American Express clients' business after they left, in violation of their contractual duties.

67.    Representatives of American Express sought to obtain the records and files of their clients from DeGon and Bruce. On May 10 and 11, 2004, a representative of American Express contacted both DeGon and Bruce, but both refused to return any files.

68.    DeGon and Bruce have continued, through May 11, 2004, to use American Express' computer system to service clients.

69.    DeGon and Bruce have failed to remove American Express' computer software from their computers or otherwise comply with their obligations under their Franchise Agreements.

70.    Although DeGon and Bruce already have acted to harm American Express, they are poised to inflict further, greater harm by attempting to destroy and divert many more of the relationships American Express has with the clients formerly assigned to them.

19

71.    DeGon and Bruce continue to have possession and control of American Express' confidential information and trade secrets, including detailed, confidential lists of American Express' clients and client information, and have not deleted all software and other computer programs provided by American Express.

72.    DeGon and Bruce have used and, on information and belief, will continue to use the American Express confidential information and trade secrets in their possession or control to solicit American Express' clients, to divert their business from American Express to a competitive business, and otherwise to engage in acts constituting conversion and misappropriation of American Express' confidential information and trade secrets, breach of fiduciary duties, and other tortious conduct.

73.    American Express has requested that DeGon and Bruce comply with the provisions of their Franchise Agreements.  DeGon and Bruce have refused.

## COUNT I
## BREACH OF CONTRACT – DeGON

74.    American Express repeats and realleges Paragraphs 1 through 73 of this Complaint as if fully set forth herein.

75.    DeGon has violated and threatens to violate the provisions of Section 18 of the DeGon Franchise Agreement by:

(a)    Continuing to represent herself and hold herself out as a franchisee of American Express;

(b)    Continuing to use American Express' Proprietary Marks;

(c)    Continuing to use American Express' signs and advertising materials;

(d)    Continuing to use American Express' Confidential Information, confidential methods, procedures, and techniques;

20

(e)     Using the telephone number and facsimile number used in the Independent

Financial Advisor Business while affiliated with American Express;

(f)     Retaining all client records; and

(g)     Continuing to use American Express' computer software and failing to erase,

destroy, or remove such software from her computers.

76.     DeGon further has violated and threatens to violate Section 19 of the DeGon Franchise

Agreement by soliciting or assisting others in soliciting American Express' clients to her new venture.

77.     As a direct and proximate result of DeGon's breach and threatened breach of the DeGon

Franchise Agreement, American Express has suffered damages in excess of $75,000.  American Express

will continue to suffer said injury, loss, harm or damage, unless and until DeGon is restrained from her

unlawful conduct.

78.     As a direct and proximate result of DeGon's breach of the DeGon Franchise Agreement,

American Express has suffered additional damages, which continue to accrue in the form of attorneys'

fees and costs related to this litigation.

## COUNT II
## BREACH OF CONTRACT – BRUCE

79.     American Express repeats and realleges Paragraphs 1 through 78 of this Complaint as if

fully set forth herein.

80.     Bruce has violated and threatens to violate the provisions of section 18 of the Bruce

Franchise Agreement by:

(a)     Continuing to represent himself and hold himself out as a franchisee of American

Express;

(b)     Continuing to use American Express' Proprietary Marks;

(c)     Continuing to use American Express' signs and advertising materials;

21

(d)    Continuing to use American Express' Confidential Information, confidential methods, procedures, and techniques;

(e)    Using the telephone number and facsimile number used in the Independent Financial Advisor Business while affiliated with American Express;

(f)    Retaining all client records; and

(g)    Continuing to use American Express' computer software and failing to erase, destroy, or remove such software from his computers.

81.    Bruce further has violated and threatens to violate Section 19 of the Bruce Franchise Agreement by soliciting or assisting others in soliciting American Express' clients to his new venture.

82.    As a direct and proximate result of Bruce's breach and threatened breach of the Bruce Franchise Agreement, American Express has suffered damages in excess of $75,000. American Express will continue to suffer said injury, loss, harm or damage, unless and until Bruce is restrained from his unlawful conduct.

83.    As a direct and proximate result of Bruce's breach of the Bruce Franchise Agreement, American Express has suffered additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation.

**COUNT III**
**MISAPPROPRIATION OF CONFIDENTIAL INFORMATION –**
**DeGON & BRUCE**

84.    American Express repeats and realleges Paragraphs 1 through 83 of this Complaint as if fully set forth herein.

85.    American Express has protectable confidential information in its client names, addresses, and data, including suitability information, investments and investment history, financial plans, and

financial goal information, prospective client names, addresses, and data, and know-how concerning the methods of operation, client lists and other financial information.

86.     American Express derives economic value from this confidential information, due to it not being generally known to other persons who could obtain economic value from its disclosure or use.

87.     American Express has made reasonable efforts under the circumstances to maintain the secrecy and confidentiality of its confidential information.

88.     DeGon has misappropriated American Express' confidential information and, on information and belief, is using this information to compete with American Express and to injure American Express' relationships with its clients.

89.     Bruce has misappropriated American Express' confidential information and, on information and belief, is using this information to compete with American Express and to injure American Express' relationships with its clients.

90.     American Express has been injured and is continuing to be injured by DeGon's and Bruce's misappropriation of its confidential information.

## COUNT IV
## VIOLATION OF § 43(a) OF THE LANHAM ACT –
## DeGON & BRUCE

91.     American Express repeats and realleges Paragraphs 1 through 90 of this Complaint as if fully set forth herein.

92.     Section 43(a) of the Lanham Act creates civil liability for:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

> (a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

23

(b) in commercial advertising or promotion, misrepresented the nature . . . of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

93.     American Express has commercially valuable, recognizable and registered names and marks.

94.     By retaining telephone numbers associated by the investing public with American Express, misrepresenting the nature of Defendants' obligations to American Express, misrepresenting the nature of American Express' products and services, misappropriating and using the registered American Express name and logo, retaining and using American Express' signs and Proprietary Marks, and otherwise, Defendants have made and are continuing to make misrepresentations and false representations and descriptions of fact regarding their obligations to American Express, as well as regarding American Express and its products and services.

95.     The public is likely to be confused and mislead by Defendants' misleading and false statements, and, on information and belief, these false statements have led to actual consumer confusion.

96.     Section 43(a) has been violated by the Defendants' false, implied representations regarding American Express.

97.     Defendants' false and misleading representations were made willfully and intentionally.

98.     Defendants' false and misleading representations causes injury to American Express, and their activities have an effect on interstate commerce.

## COUNT V
## BREACH OF FIDUCIARY DUTY –
## DeGON & BRUCE

99.     American Express repeats and realleges Paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100.    As American Express financial advisors who were allowed access to American Express' confidential information, Defendants owed and owe American Express certain fiduciary duties.

24

101.    Among these fiduciary duties are the duty to preserve American Express' confidential information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to American Express' interests.

102.    Defendants breached these duties while affiliated with American Express by, among other things, soliciting, diverting, and attempting to divert American Express clients they were working with, on behalf of American Express, for their own benefit; converting American Express' confidential information and trade secrets for their personal use; and by using American Express' confidential information against American Express' best interests.

103.    American Express has been injured and is continuing to be injured by Defendants' breaches.

**COUNT VI**
**CONVERSION OF CLIENT FILES –**
**DeGON & BRUCE**

104.    American Express repeats and realleges Paragraphs 1 through 103 of this Complaint as if fully set forth herein.

105.    DeGon and Bruce have wrongfully and without authorization retained possession, custody, or control over certain American Express client records and files.

106.    American Express is the rightful owner of such American Express client records and files.

107.    American Express' right to possession of its property is immediate, absolute, and unconditional.

108.    American Express has been injured and is continuing to be injured by DeGon's and Bruce's misappropriation.

## COUNT VII
## INTENTIONAL INTERFERENCE WITH
## PROSPECTIVE BUSINESS RELATIONSHIPS –
## DeGON & BRUCE

109.    American Express repeats and realleges Paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.    American Express reasonably expects to enter into valid business relationships with its clients.

111.    On information and belief, Defendants are aware of American Express' expectancy to enter into valid business relationships with its clients.

112.    Defendants have interfered with and, on information and belief, will continue purposefully to interfere with these prospective business relationships.

113     Defendants' interference has or will prevent American Express' legitimate expectancies from ripening into valid business relationships.

114.    On information and belief, Defendants are intentionally interfering with these prospective business relationships and, by doing so, intend to financially injure American Express.

115.    American Express has been injured and is continuing to be injured because of Defendants' tortious interference with its prospective business relationships.

## COUNT VIII
## UNFAIR COMPETITION –
## DeGON & BRUCE

116.    American Express repeats and realleges Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

117.    Defendants' actions constitute unfair competition.

118.    As a result of Defendants' unlawful actions, American Express has been injured and will continue to be injured unless and until DeGon and Bruce are restrained from their unlawful conduct.

26