UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN EXPRESS FINANCIAL ADVISORS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARY R. DeGON AND MATTHEW M. BRUCE, <br><br> Defendants. | Civil Action No. _____ <br> 04-10979 RGS |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

On May 3, 2004, after weeks of discussing their futures, Defendants Mary R. DeGon ("DeGon") and Matthew M. Bruce ("Bruce") each submitted a written resignation, terminating their affiliation as financial advisors with Plaintiff American Express Financial Advisors, Inc. ("AEFA" or "American Express"). Instead of following the lead of other advisors who have properly terminated their affiliation with American Express, DeGon and Bruce each back-dated their notification to April 5, and stated their resignation actually had become effective April 19, 2004 – two weeks *before* they actually delivered notification to AEFA's Corporate Office. They engaged in these improper tactics to, among other things, obtain certain contractual benefits to which they were not otherwise entitled.

Aside from how Defendants resigned, there is no question that they have terminated their affiliation with AEFA. Yet, Defendants continue to represent and hold themselves out as a franchise of AEFA, use AEFA's Proprietary Marks, use AEFA's signs and advertising materials, use the same AEFA telephone and facsimile numbers, use AEFA's computer software, and

access AEFA's national computer system without any authorization whatsoever. In addition, Defendants refuse to return AEFA's confidential client information notwithstanding their contractual obligations to do so, and repeated requests by AEFA that they comply. In so doing, Defendants have misappropriated AEFA's confidential information and trade secrets, all for the apparent purpose of soliciting AEFA's clients for their new venture, all in violation of their legal obligations..

Through this motion, AEFA seeks to preserve the *status quo* by stopping Defendants from continued unauthorized use of its proprietary marks and misappropriation of its confidential information and trade secrets, and to prevent the further solicitation and diversion of AEFA clients, pending a hearing and decision before the National Association of Securities Dealers, Inc.[1]

## I. BACKGROUND

### A. Defendants' Affiliation with AEFA

From March of 2000 until their resignations on May 3, 2004, Defendants were franchisees of AEFA, working as financial advisors for AEFA in Pembroke, Massachusetts.

---

[1] In conjunction with this motion, AEFA has filed a claim for arbitration with the National Association of Securities Dealers, Inc. ("NASD"). The NASD will have ongoing jurisdiction over this dispute because both Defendants were registered brokers and had executed NASD Form U-4 which provides for arbitration of disputes. Under the NASD's Code of Arbitration Procedure, and specifically Rule 10201, all disputes between NASD member firms, such as AEFA, and associated persons of NASD member firms, such as DeGon and Bruce, must be submitted for mandatory arbitration before the NASD. However, the NASD's procedures specifically require a party seeking a temporary injunction relief to do so *first* from a Court, so that the *status quo* will be maintained while expedited proceedings are sought before the NASD. See NASD Code of Arbitration Procedure, Rule 10335, Exhibit A to the Affidavit of Anthony Scibelli ("Scibelli Aff."). This rule recognizes the fact that injunctive relief before a Court is usually considered and ruled on within a matter of days or hours, whereas similar proceedings before the NASD, even on an expedited basis, may take much longer. Once the Court issues temporary injunctive relief, the NASD rules specifically require that a hearing for continuing injunctive relief must be commenced by the NASD within ***fifteen days*** of the date of any order granting a temporary injunctive order. Rule 10335(b)(1).

Affidavit of Susan Lamb ("Lamb Aff.") at ¶¶ 15-16. Prior to becoming franchisees, DeGon had been an employee and then an independent contractor with AEFA since December, 1987, *id.* at ¶ 4, while Bruce had been an employee and then an independent contractor since October, 1996. *Id.* at ¶ 9. During this time, AEFA had trained and supported both DeGon and Bruce, neither of whom had any experience as a financial advisor prior to joining AEFA. *Id.* at ¶¶ 4, 5, 8, 9, 10 & 14.

Throughout their affiliation, AEFA assisted Defendants in developing and expanding the base of AEFA clients with which they worked. *Id.* at ¶¶ 8 & 14. AEFA allowed Defendants to use its trade name and logo, provided them with AEFA client accounts, client referrals, and reassignments of client accounts. *Id.* at ¶¶ 14 & 17. Further, at AEFA's expense, Defendants received ongoing training and education in investment planning methods and procedures and new and more sophisticated investment techniques. *Id.* Defendants also received sales, research, and promotional support through AEFA's network of financial professionals. *Id.* at ¶ 19.

Due to their affiliation, AEFA granted Defendants access to its confidential books and records, and provided Defendants the identity, addresses, and account information of hundreds of AEFA clients whose accounts they were assigned. *Id.* As part of its long-term strategy, AEFA encouraged Defendants to build valuable and lasting financial planning relationships with its clients. *Id.* at ¶¶ 20-21.

Through their affiliation with AEFA, Defendants became successful financial advisors. At the time they terminated their affiliations, DeGon had 305 client group accounts, containing more than $38.7 million in assets, and in 2003 had earned in excess of $180,000, while Bruce had 87 client group accounts, with more than $7.7 million in assets, and had earned in excess of $92,000 in 2003. *Id.* at ¶ 22.

### B. Defendants' Franchise Agreement with AEFA

Defendants' relationships with AEFA were governed by American Express Financial Advisors, Inc. Independent Advisor Business Franchise Agreement ("Franchise Agreement").[2] The Franchise Agreements executed by both Defendants contain certain requirements of Defendants upon the termination of their affiliation with AEFA. Among those obligations are the requirements that Defendants must: (1) cease operating as an AEFA franchise; (2) cease using confidential information; (3) cease using AEFA's proprietary marks; (4) cease using AEFA's telephone numbers; (5) immediately return all AEFA manuals, records, and other confidential information; and (6) discontinue using AEFA's computer software. Lamb Aff., Ex. A, ¶ 18. In addition, Defendants each must return all confidential and proprietary business records, including the original records of the AEFA clients to whom they provided services, within five (5) business days of termination. *Id.*, Ex. C, ¶ 3.

Further, for a one-year period, each Defendant must refrain from soliciting or redirecting the business of the clients with whom they had worked, or of whom they had learned, while associated with AEFA. Franchise Agreement at ¶¶ 10, 18-19. Specifically, Section 19 of the Franchise Agreement contains a nonsolicitation clause, which provides, in part:

COVENANTS. . . . .

- Independent Advisor specifically acknowledges that, pursuant to this Agreement, Independent Advisor will receive additional substantive rights as a franchisee of AEFA. Independent Advisor also recognizes he or she will receive valuable and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of AEFA and the System. In recognition of and in consideration for these and other benefits, to protect the confidentiality of AEFA's Client information and to protect AEFA's goodwill, Independent Advisor covenants that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within which Independent

---

[2] A copy of the entire Franchise Agreement is attached as Ex. A, and with DeGon's signature page attached as Ex. B and Bruce's signature page attached as Ex. C, to the Lamb Aff.

4

Advisor operates or operated, Independent Advisor agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

    a.    (1)    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate an agreement with AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System;

        (2)    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate, surrender, redeem, or cancel any action related to Products & Services acquired or ordered from or through AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System, except as provided in the Manuals or with AEFA's written approval and consent;

        (3)    Solicit any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement to open an account other than an AEFA account or to sell any investment, financial or insurance products or services other than through AEFA with AEFA's written approval and consent; . . . .

### C.    Addendum 3-R to the Franchise Agreement

Because both DeGon and Bruce were advisors at the time the Franchise Agreements were implemented in 2000, they were eligible for Addendum 3-R to the Franchise Agreement. Under the express terms of Addendum 3-R, which both Defendants executed, AEFA agrees to forbear from the enforcement of certain of its designated rights under the Franchise Agreement, including the prohibition against soliciting and diverting AEFA clients for one year post-termination, if Defendants satisfy certain explicit conditions. A copy of DeGon's Addendum 3-R is attached as Ex. C, and Bruce's Addendum 3-R is attached as Ex. E, to the Lamb Aff. Among the explicit conditions that DeGon and Bruce had to satisfy were the requirement that the franchisee must have been affiliated with AEFA for at least six consecutive years, not been subject to discipline as a result of a violation of the Companies' Compliance Rules, have provided two-weeks' written notice of termination, and have otherwise complied with the termination obligations specified in the Franchise Agreement. Addendum 3-R at ¶ C.

While their tenure with AEFA allowed them to satisfy the first obligation, Defendants failed to, among other things, comply with their termination obligations by: (1) failing to provide a two-week notice; (2) continuing to represent themselves, and hold themselves out as a franchisee of AEFA; (3) continuing to use AEFA's Proprietary Marks; (4) continuing to use AEFA's signs and advertising materials; (5) continuing to use AEFA's confidential information, confidential methods, procedures, and techniques; (6) using the telephone number and facsimile number used while affiliated with AEFA; and (7) continuing to use AEFA's computer software while failing to erase, destroy, or remove such software from their computers. Lamb Aff. at ¶ 32; Affidavit of Siobhan Fitzgerald ("Fitzgerald Aff.") at ¶¶ 8-13. Accordingly, Defendants failed to qualify for the forbearance provisions of Addendum 3-R and remain subject to the post-affiliation limitations contained in Section 19 of their Franchise Agreements.

### D.     Defendants' Improper Conduct

On or about March 23, 2004, AEFA Field Vice President Susan Lamb learned that DeGon and Bruce intended to leave AEFA. Lamb Aff. at ¶ 23. Shortly thereafter, Ms. Lamb met with another AEFA advisor who said that he was in negotiations to purchase part of DeGon's and Bruce's practices. *Id.* Ms. Lamb informed that advisor that pursuant to the franchise agreement he would need to obtain permission from AEFA before that transaction could occur. *Id.*

Over the following weeks, AEFA representatives spoke with DeGon and Bruce on several occasions to encourage them to stay with AEFA and discuss their future plans. Lamb Aff. at ¶ 24-25. However, on April 12, 2004, DeGon and Bruce sent an email to their Group Vice President, stating that they had decided that they would leave AEFA. *Id.* at ¶ 26.

After learning that DeGon planned to leave, Ms. Lamb spoke with DeGon and reminded her that she could qualify for the Addendum 3-R provisions, which would allow her to compete

with AEFA within two weeks after terminating her affiliation. Lamb Aff. at ¶ 27. Ms. Lamb further reminded DeGon that she needed to comply with all the provisions of Addendum 3-R, including the need to provide two weeks written notice of termination to both the Group Vice President and the Corporate Office. *Id.*[3]

Despite this notice, both DeGon and Bruce failed to comply with the two-week written notice requirement. Rather, on May 3, 2004, both DeGon and Bruce submitted letters, by facsimile, to AEFA's Corporate Office, terminating their affiliation with AEFA. Lamb Aff. at ¶ 30, Ex. F; Fitzgerald Aff. at ¶ 5. They back-dated these letters to April 5, 2004, and stated that DeGon and Bruce intended that their affiliation with AEFA had terminated as of April 19, 2004. *Id.* AEFA processed their resignation requests on May 6, 2004, and noted that their resignations were effective as of April 19, 2004. Fitzgerald Aff. at ¶ 5, Exs. 1 & 2. Whether effective April 19 or May 3, Defendants at no time gave the requisite two-week notice.

Before leaving AEFA, DeGon and Bruce had been in communication with certain of AEFA's clients, soliciting them to modify or close their AEFA accounts. Lamb Aff. at ¶ 33. AEFA believes DeGon and Bruce took these actions so that they could easily move these clients' investments to their new venture. Defendants have continued to solicit clients after their resignation in further violation of the Addendum 3-R and the Franchise Agreement. *Id.*

After terminating their affiliation with AEFA, Defendants continue to represent themselves, and hold themselves out, as an AEFA franchise. Lamb Aff. at ¶ 32; Fitzgerald Aff. at ¶ 11. They continue to display signs at their office indicating their affiliation with AEFA and

---

[3] DeGon told Ms. Lamb that she felt she had complied with the two-week notice provision because she had submitted a request to sell her practice to another advisor. Lamb Aff. at ¶ 27. This explanation makes no sense because AEFA advisors may sell their right to service the AEFA client base or a portion of that client base to other AEFA advisors even if they are not leaving the company. Ms. Lamb again reminded DeGon that her notice of an intent to sell her practice was insufficient and that she needed to follow the specific requirements of

have retained the telephone and facsimile numbers associated with their former AEFA franchise. Lamb Aff. at ¶ 32; Fitzgerald Aff. at ¶¶ 10, 11. This is true whether the resignation occurred on April 19 or May 3, 2004.

In addition to soliciting AEFA clients, Defendants misappropriated AEFA's confidential information and trade secrets. Due to their affiliation with AEFA, Defendants were in possession of AEFA's client records and files containing confidential information and trade secrets. Lamb Aff. at ¶ 35. Upon the termination of their affiliation with AEFA, Defendants were obligated to immediately return all client records and files. Lamb Aff., Ex. A, ¶ 18. However, as of May 14, 2004, Defendants have failed to return *any* client files or other client information, despite repeated requests. Fitzgerald Aff. at ¶¶ 6-9. Bruce has informed AEFA that Defendants are not returning any client files and will not allow an AEFA representative to pick them up. *Id.* at ¶ 8. Defendants certainly know that their failure to return these materials improves their ability to solicit and divert AEFA clients and places AEFA at a significant disadvantage in attempting to maintain its relationship with its clients. Lamb Aff. at ¶ 37. Moreover, not only is this client information confidential pursuant to AEFA policy, it is confidential pursuant to government regulations as well. *Id.* at ¶ 36.

Defendants also have continued to use AEFA's computer software and have failed to erase, destroy, or remove such software from their computers. Lamb Aff. at ¶ 32; Fitzgerald Aff. at ¶ 12. Further, both DeGon and Bruce have improperly accessed American Express' computer system numerous times between April 19, 2004 and May 11, 2004. Fitzgerald Aff. at ¶ 11, Exs. 3 & 4. Through this access, Defendants have reviewed confidential client information and even redeemed funds—*after* both the "effective" date, and actual date they submitted their resignations. *Id.* Indeed, when AEFA discovered and closed off his improper access, DeGon

---

Addendum 3-R. *Id.*

8

sent an email stating that she had been "shut down from" AEFA's Online Service and Transaction program and could not gain access to the computer system. Lamb Aff. at ¶ 31, Ex. G. DeGon inquired whether she should call in, or have someone else take care of "some things that need to be done." *Id.*

DeGon and Bruce are bound by the post-termination provisions of their Franchise Agreements, including the one-year prohibition against soliciting or redirecting the investment and insurance business of the AEFA clients with whom they had worked while affiliated with AEFA, but have failed to honor those obligations. AEFA therefore requests that this Court issue a preliminary injunctive order restoring the *status quo* and stopping DeGon's and Bruce's ongoing breaches and violations, pending the NASD hearing and decision on AEFA's request for immediate injunctive relief.

## II.   ARGUMENT

### A.   Preliminary Injunction Standard

A party seeking a preliminary injunction must establish that (1) it is substantially likely to succeed on the merits of its claim, (2) absent the injunction there is a significant risk of irreparable harm, (3) the balance of the hardships weighs in its favor, and (4) the injunction will not harm the public interest. *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 33 (1st Cir. 1998).[4] "Likelihood of success in the main bearing wall of the four-factor framework." *Ross-*

---

[4]   In the Franchise Agreement, Defendants expressly agreed that American Express is entitled to an injunction from the Court to keep them from violating their obligations. Lamb Aff. Ex. A, at ¶ 19 and Addendum 3-R at ¶ I (providing for a 45-day injunction). Even if portions of this dispute may be eligible for NASD arbitration (if, for example, Defendants remain subject to NASD jurisdiction), the Court has jurisdiction to grant preliminary injunctive relief pending that possible arbitration. *See Wells v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 919 F. Supp. 1047, 1050 (E.D. Ky. 1994) (observing that preliminary injunction hearings may go forward in Court even though dispute is subject to arbitration) and cases cited therein; *see also* NASD Code of Arbitration Procedure § 10335 (expressly authorizing parties subject to NASD arbitration to seek interim injunctive relief from courts pending determination of final relief from NASD

*Simons of Warwick, Inv. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1t Cir. 1996). The greater the likelihood of success on the merits, the less risk of irreparable harm to the plaintiff must be shown. *Id.* at 19.

**B.     Choice of Law**

A federal court sitting in a diversity action must apply the choice of law rules of the forum state. *Engine Specialties, Inc. v. Bombardier, Ltd.*, 605 F.2d 1, 19 (1st Cir. 1979); *Alves v. Siegel's Broadway Auto Parts, Inc.*, 710 F. Supp. 864, 865 (D. Mass. 1989) (citing *Klaxon v. Stentor Elec.*, 313 U.S. 487, 496 (1941)). The Franchise Agreement provides that it is to be "interpreted and construed exclusively under the laws of the State of Minnesota." Franchise Agreement at ¶ 26. Massachusetts courts uphold contractual "choice of law provisions so long as there is no serious conflict with the public policy of Massachusetts and the designated state has some substantial relation to the contract." *Comdisco Disaster Recovery Servs., Inc.*, 789 F. Supp. 48, 52 (D. Mass. 1992) (citing *Morris v. Watsco, Inc.*, 433 N.E.2d 886, 888 (Mass. 1982) and *Steranko v. Inforex, Inc.*, 362 N.E.2d 222, 228 (Mass. App. Ct. 1977)).

In this case, both prongs of the test are met. First, application of Minnesota law would not be contrary to a fundamental policy of Massachusetts. Minnesota, like Massachusetts, enforces restrictive covenants, such as the one at issue, that are reasonably necessary to protect a legitimate business interest, are reasonable in scope and duration and are not injurious to the public. *Compare Walker Employment Serv. v. Parkhurst*, 219 N.W.2d 437, 441 (Minn. 1974); *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 899-900 (Minn. 1965) (Minnesota courts will

---

arbitrators) (attached as Exs. A & B to the Scibelli Aff.); *Am. Express Fin. Advisors Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997) (holding that America Express' right to an injunction is reserved for the courts); *Koob v. IDS Fin. Servs. Inc.*, 629 N.Y.S. 2d 426, 431 (N.Y. App. Div. 1995) (holding that American Express' contracts "removes the matter [of interim injunctive relief] from the authority of the arbitrator" and reserves it for the courts). A copy of the Statement of Claim filed with the NASD is attached to the Scibelli Aff. as Ex. C.

uphold a covenant not to compete if it is "for a just and honest purpose, for the legitimate interest of the party in whose favor it is imposed, reasonable as between parties, and not injurious to the public") *with Novelty Bias Binding Co. v. Shevrin,* 175 N.E.2d 374, 376 (Mass. 1961) (In Massachusetts, a restrictive covenant is enforceable if it is "necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with the public interest."); *New England Canteen Serv., Inc. v. Ashley,* 363 N.E.2d 526, 674 (Mass. 1977) (trade secrets, confidential data and goodwill are all legitimate business interests of the employer that it may seek to protect by restrictive covenant).

As to the second prong, Minnesota has a substantial relationship to the parties and the relationship between them. AEFA has its principal place of business in Minneapolis, Minnesota. Throughout their affiliation with AEFA, DeGon and Bruce received training and support from the AEFA Corporate Office Minnesota, including intensive two-week training sessions in Minnesota. Lamb Aff. at ¶¶ 5-14. DeGon and Bruce also had numerous telephone and computer contacts with the Corporate Office in Minnesota. *Id.* These facts establish a reasonable basis for the choice of Minnesota law. *See, e.g., Vesprinir v. Shaw Indus., Inc.,* 221 F. Supp. 2d 44, 61 (D. Mass. 2002) (honoring Georgia choice of law provision where one of the parties had its principal place of business in Georgia, the agreement was signed by the parties in Georgia and Georgia bore a reasonable relationship to the contractual transaction between the parties). Accordingly, this Court should honor the parties' choice of Minnesota law.

    C.    **AEFA Has a Likelihood of Success on the Merits**

        1.    **Breach of Contract**

            a.    The Contracts Are Enforceable

A covenant not to compete is enforceable under Minnesota law if consideration was given for the covenant and if the restriction is reasonable to protect a legitimate business interest.

11

*Webb Publ'g Co. v. Fosshage*, 426 N.W.2d 445, 449-450 (Minn. Ct. App. 1988); *Overholt Crop Ins. Serv. Co. v. Bredeson*, 437 N.W.2d 698, 703-04 (Minn. Ct. App. 1989). In this case, Defendants executed their Franchise Agreements, containing the restrictive covenants, on December 20, 1999 and December 21, 1999, and those Franchise Agreements became effective on March 22, 2000, in conjunction with AEFA's implementation of its franchise program. Lamb Aff. at ¶¶ 6 & 12. (These covenants replaced effectively identical covenants in Defendants' prior independent contractor agreements signed when first joining AEFA.) Minnesota law provides that entering into a restrictive covenant at the commencement of, and as a condition of, a relationship provides adequate consideration. *Overholt*, 437 N.W.2d at 702; *see also Blackwell v. E.M. Helides, Jr., Inc.*, 331 N.E.2d 54, 56 (Mass. 1975) (restrictive covenant enforceable where it was condition of employment and agreement was executed in advance of employment).

Under Minnesota law, AEFA has a legitimate interest in protecting itself against "the deflection of trade or customers by the employee by means of the opportunity which the employment has given him." *Bennett*, 134 N.W.2d at 898; *Overholt*, 437 N.W.2d at 703; *Webb Publishing*, 426 N.W.2d at 450. Indeed, a Massachusetts court has found that AEFA "has a legitimate interest in protecting the client goodwill it creates for its financial advisors." *Am. Express Financial Advisors, Inc. v. Walker*, No. CIV.A. 98-01673, 1998 WL 754620, at *6 (Mass. Super. Oct. 28, 1998) (attached as Ex. D to Scibelli Aff.). The court noted:

> [T]o a client, the financial advisor may have become the embodiment of American Express since all that American Express had to offer appeared to emanate from the financial advisor. Indeed, American Express expressly encouraged its planners to develop this type of close one-to-one relationship with its clients, because it recognized that loyalty to an institution is more likely when there is loyalty to a person affiliated with that institution. Because its goodwill is inextricably interwoven with that of its financial advisors, American Express may fear that its goodwill will travel with their financial advisors when they leave American Express.

*Id.* In that case, the Court held that it is reasonable for AEFA to attempt to protect its goodwill

12

and its confidential information through a restrictive covenant, and granted AEFA a preliminary injunction. *Id.* at *8.[5]

Secondly, the restrictions are narrowly tailored to provide AEFA a reasonable period of time, one year, to protect its confidential information and trade secrets and to protect against the deflection of its goodwill with its clients by reestablishing those relationships.[6] Minnesota expressly permits the use of restrictive covenants to protect confidential information, *Cherne Indus. v. Grounds & Assocs.*, 278 N.W.2d 81, 92 (Minn. 1979), and the substitution of customer restrictions for geographic restrictions. *Overholt*, 437 N.W.2d at 703; *IDS Life Ins. Co. v. SunAm., Inc.*, 958 F. Supp. 1258, 1273 (N.D. Ill. 1997) (applying Minnesota law and finding covenant containing customer restriction enforceable); *see also Higdon Food Serv., Inc. v. Walker*, 641 S.W.2d at 751-52 (finding covenant containing customer restriction enforceable). The restrictive covenants clearly are enforceable and, as show below, there is strong evidence regarding Defendants' breach.

        b.      <u>The Evidence Demonstrates Defendants' Breach</u>

Since terminating their affiliation with AEFA, Defendants continue to represent

---

[5] The court enforced the full term of the nonsolicitation provision (one year), but only enforced the noncompete for four months. *Walker*, 1998 WL 754620, at *8. (The court also noted that its holding diverted from several other courts which have upheld the one year noncompete provision. *Id.* at *9.) While the contract at issue in *Walker* was an independent contractor agreement, the predecessor to the Franchise Agreement at issue in this matter, the purpose of the two agreements are identical. Moreover, AEFA is not seeking a ruling from this Court on whether a permanent injunction is needed, but rather requests only that the Court maintain the *status quo* until the NASD can rule on the merits, in accordance with the NASD Rules.

[6] Courts in both Minnesota and Massachusetts have consistently affirmed covenants not to compete for terms of one or two years. *See, e.g., Walker Employment Serv., Inc. v. Parkhurst*, 219 N.W.2d 437, 442 (Minn. 1974) (one-year); *Webb Publ'g*, 426 N.W.2d at 450 (18 months); *Alside, Inc. v. Larson*, 220 N.W.2d 274, 280 (Minn. 1974) (two years); *Oxford Global Resources, Inc. v. Guerriero*, 2003 WL 23112398, at *9 (D. Mass. Dec. 30, 2003) (one year); *All Stainless, Inc. v. Colby*, 308 N.E.2d 481 (Mass. 1974) (two years).

13

themselves, and hold themselves out as a franchisee of AEFA. Lamb Aff. at ¶ 32; Fitzgerald Aff at ¶ 11. They continue to display signs at their office indicating their affiliation with AEFA. Lamb Aff. at ¶ 32; Fitzgerald Aff at ¶ 11. Defendants have retained their old AEFA telephone and facsimile numbers. Lamb Aff. at ¶ 32; Fitzgerald Aff at ¶ 10.

Moreover, Defendants wrongfully retained confidential client information and documents containing trade secrets, including all of their client files. Lamb Aff. at ¶ 33; Fitzgerald Aff. at ¶¶ 8-9. Despite repeated requests, DeGon and Bruce have refused to return *any* client files or other client information, Fitzgerald Aff. at ¶¶ 6-9, in direct violation of the Franchise Agreement. *See* Franchise Agreement at ¶ 18. Bruce has informed AEFA that Defendants are not returning any client files and will not allow an AEFA representative to pick them up. *Id.* at ¶ 8. Defendant's failure to return these materials improves their ability to solicit and divert AEFA's clients and places it at a significant disadvantage in attempting to maintain its relationship with its clients. Lamb Aff. at ¶ 37. Moreover, not only is this client information confidential pursuant to AEFA policy, it is confidential pursuant to government regulations as well. *Id.* at ¶ 36.

The evidence further bears out Defendants' intent to move AEFA's clients as before leaving AEFA, DeGon and Bruce both communicated with certain AEFA clients, soliciting them to modify their AEFA accounts. By making such modifications, Defendants could easily move the investments of those clients to their new venture. The evidence also suggests that Defendants have continued to solicit clients after Defendants' resignation. Lamb Aff. at ¶ 33.

Defendants have also continued to use AEFA's computer software and have failed to erase, destroy, or remove such software from their computers. Lamb Aff. at ¶ 32; Fitzgerald Aff. at ¶ 12. Both DeGon and Bruce have accessed AEFA's computer system numerous times between April 19, 2004 and May 11, 2004. Fitzgerald Aff. at ¶ 11 and Exs. 3 & 4. Through AEFA's computer system, Defendants have reviewed confidential client information and even

14

redeemed funds—*after* their resignations. *Id.*

In this case, AEFA seeks protection of its confidential client information, goodwill and business relationships, and the retention of its clients.[7] Defendants, over the course of the years each has been affiliated with AEFA (sixteen for DeGon and seven for Bruce), have had access to, and regularly used, confidential client information concerning AEFA's business. Defendants were also responsible for developing and cultivating goodwill on behalf of AEFA. Lamb Aff. at ¶¶ 20-21. They were the very face of the AEFA business. *Id.*; *see also Walker*, 1998 WL 754620, at *6. They used the AEFA name, information systems, data, resources, and training, to become the skilled financial advisors necessary to service a combined aggregate client base of approximately 392 AEFA clients account groups, and to control over $46.4 million dollars in client assets. Lamb Aff. at ¶ 22. Defendants now seek to compete with AEFA by soliciting its clients with confidential information that they obtained while working for AEFA. These actions are in direct violation of the terms of Defendants' Franchise Agreements.

Because of the strong evidence against Defendants demonstrating the breach of their agreements, AEFA's legitimate protectable interests, and the reasonableness of the covenants not to compete, AEFA has a strong likelihood of success on the merits.

### 2. Violation of the Lanham Act

Defendants' violation of 15 U.S.C. § 1125(a)[8] (unfair competition) also creates the

---

[7] AEFA is not requesting that the Court prevent its clients from voluntarily leaving AEFA, or that DeGon and Bruce be prevented from servicing those clients who have already left AEFA as those issues will be addressed by the NASD arbitration. Rather, AEFA merely seeks the prevention of ongoing breaches and other actions inconsistent with DeGon's and Bruce's obligations under their respective Franchise Agreements.

[8] Section 1125(a) provides, in pertinent part: "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or devise, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-- (A) is likely

15

likelihood of consumer confusion, generally the key element of a claim for federal unfair competition. *See, e.g., Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 492-93 (1st Cir. 1981). The First Circuit has an eight-point test for causing confusion under the Lanham Act: (1) the similarity of the marks; (2) the similarity of the goods, (3) the relationship between the parties' channel of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendants' intent in adopting the mark; and (8) the strength of the mark. *See e.g., Volkswagenwerk AG v. Wheeler,* 814 F.2d 812, 817 (1st Cir. 1987).

The general requirement underlying a showing of the likelihood of confusion is that the public believes that the mark's owner sponsored or otherwise approved the use of the trademark. Here, it is very likely that the public will continue to believe that Defendants continue to be affiliated with AEFA. Despite the specific contractual requirement that they disconnect their telephone number upon termination, Defendants have kept the same number so that anyone looking up AEFA in the telephone book finds Defendants' phone number and, while intending to call AEFA, now reach Defendants' new venture. Likewise, Defendants are causing confusion by continuing to use AEFA's signs and proprietary marks. *See, e.g., Hair Assoc., Inc. v. Nat'l Hair Replacement Servs., Inc.,* 987 F. Supp. 569, 590 (W.D. Mich. 1997) ("Where former franchisees or licensees continue to use marks or confusingly similar marks after the licenses is terminated, consumer confusion is inevitable;" "[T]he problem is further accentuated by the fact that defendants also remained in the same location where they had been as a franchise"). Because of the likelihood of confusion, AEFA has a strong likelihood of success on its Lanham Act claim.

---

to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person

### D. Preliminary Injunctive Relief Will Prevent The Irreparable Harm To AEFA For Which No Adequate Legal Remedy Exists

Unless this Court grants the requested injunctive relief, AEFA will suffer irreparable injury through the loss of confidential client information and Defendants continued use of AEFA's signs and Proprietary Marks. Defendants wrongfully retained confidential client information and documents containing trade secrets, including all of their client files. Lamb Aff. at ¶ 33; Fitzgerald Aff. at ¶¶ 8-9. Despite repeated requests, DeGon and Bruce have refused to return *any* client files or other client information, Fitzgerald Aff. at ¶¶ 6-9, in direct violation of the Franchise Agreement. *See* Franchise Agreement at ¶ 18. If this Court does not grant preliminary injunctive relief, AEFA will continue to suffer irreparable harm from the loss of this confidential information. *See, e.g., Creative Communication Consultants v. Gaylord*, 403 N.W.2d 654, 657 (Minn. Ct. App. 1987) (irreparable harm properly found based on disclosure of confidential information).

AEFA also will suffer irreparable harm in the loss of client goodwill generated by Defendants through AEFA's support and dedication to the professional training, growth, and development of its financial advisors. It is well-established that irreparable harm can arise out of the breach of a non-compete clause. *See, e.g., Cherne*, 278 N.W.2d at 92; *see also Euctectic Welding Alloys Corp. v. West*, 160 N.W.2d 566, 569 n.4. (Minn. 1968) ("an inherent threat of irreparable injury may be inferred from the breach of an otherwise valid and enforceable restrictive covenant [not to compete or not to disclose trade secrets], sufficient to invoke at least temporary equitable relief."). Injuries such as these are difficult to identify and measure, as are the money damages resulting from the loss of clients. *Walker*, 1998 WL 754620, at *10 (holding that American Express had met its burden of establishing irreparable harm); *Medtronic, Inc. v.*

---

who believes that he or she is or is likely to be damages by such act."

*Gibbons*, 527 F. Supp. 1085, 1094 (D. Minn. 1981). Under Minnesota law, the threat of irreparable harm is inferred from a breach of a valid restrictive covenant. *Gibbons*, 527 F. Supp. at 1091-1092.

If Defendants are allowed to ignore their contractual obligations, the value of the business they capture from AEFA clients, who have come to rely on them for advice and service, and the accompanying loss of goodwill and business relationships, will be difficult to ascertain. Defendants had long-term relationships with numerous AEFA clients for whom they were the primary point of contact. *See* Lamb Aff. at ¶ 20. They spent many years servicing these clients, getting to know them and their various issues. *Id.* Defendants were, in fact, the very face of AEFA since AEFA does no direct marketing to its clients. *Id.* at ¶ 21. Defendants' disregard for the non-solicitation agreement they signed with AEFA places AEFA at a serious disadvantage in continuing to service the clients previously entrusted to them. *Id.* It is impossible to determine at this time the number of AEFA clients who will be "pirated away" by Defendants because of the breach of their Franchise Agreements, nor is it possible to determine with any degree of certainty the commissions each of these clients will generate not only this year, but 5, 10, or 20 years into the future. Defendants' breach of their post-termination covenants involves financial loss and other irreparable injuries to AEFA that are incapable of measurement.[9]

---

[9] Injunctive relief is also necessary to protect the ability of the AEFA system of offices and affiliates to discourage other affiliates from violating their Franchise Agreements. In *Merrill Lynch v. Patinkin*, No. 91 C 2324, 1991 WL 83163, *5 (N.D. Ill. May 9, 1991) (attached as Ex. E to the Scibelli Aff.), for example, the court specifically considered this risk in granting Merrill Lynch injunctive relief, stating: "The court believes that the denial of the extension of the TRO under the circumstances presented in this case would leave Merrill Lynch vulnerable to the same conduct from other employees. Hence, the potential harm plaintiff faces, on several levels, is enormous." *Id.* Without injunctive relief, AEFA will be exposed to the identical harm.

### E. The Threatened Injury to Plaintiff Outweighs the Threatened Injury to Defendants

The balance of the harms weighs in favor of granting injunctive relief. As already noted, without injunctive relief, AEFA will suffer the loss of goodwill and business relationships, and the confidentiality of client information. Numerous AEFA clients will be solicited to terminate their relationships with AEFA. Other AEFA franchisees will be encouraged to engage in similar conduct.

The requested injunction will not subject Defendants to obligations other than those that they expressly agreed to undertake. Defendants will be free to compete – anywhere they want – in the field in which AEFA trained them, so long as they are not using AEFA's confidential business and client information. *See Prudential Ins. Co. of Am. v. Tracia*, No. 20024369C, 2002 WL 31862713, at *2 (Mass. Super. Ct. Nov. 12, 2002) (holding that the balance of harms weighed in favor of plaintiff where defendant was not precluded from gainful employment at another company, even one of plaintiff's competitors) (attached as Ex. F to Scibelli Aff.).

In addition, Defendants will not be required to wait for a protracted period of time for a result on the merits of this dispute. Upon the entry of injunctive relief, the NASD will commence a hearing, within fifteen days, regarding any ongoing injunctive relief. *See* NASD Code of Arbitration Procedure, Rule 10335 (b)(1); *Tracia*, 2002 WL 31862713, at *2 (noting that defendant was entitled to a prompt hearing before the NASD).

The granting of injunctive relief will not cause undue hardship on Defendants. In contrast, without it, AEFA will suffer the loss of goodwill, business relationships, the confidentiality of client information, and numerous AEFA clients will be solicited to terminate their relationships with AEFA. As such, the balance of harms favors granting injunctive relief.

### F. The Public Interest Favors Entry Of The Injunction

Granting the requested injunctive relief, under these circumstances, does no disservice to

the public interest. AEFA's clients will be "protected by the status quo" and will not be unfairly or unknowingly diverted from their relationship with AEFA. Accordingly, the balance of factors weighs in favor of granting injunctive relief.

### III. CONCLUSION

For the foregoing reasons, AEFA respectfully requests that this Court grant its request for an immediate injunction to prevent Defendants from stealing its clients, destroying its goodwill, and misappropriating its confidential information.

Respectfully submitted,
AMERICAN EXPRESS FINANCIAL
ADVISORS, INC.

By its attorneys,

_____
Anthony A. Scibelli (BBO #556507)
Brian E. Whiteley (BBO #555683)
Scibelli and Whiteley, LLP
Old City Hall
45 School Street, 3rd Floor
Boston, MA 02108
(617) 227-5725
 -and-
Edward B. Magarian (MN No. 49219)
Todd W. Schnell (MN No. 252256)
DORSEY & WHITNEY, LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
(612) 340-2600

DATED: May 14, 2004