UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN EXPRESS FINANCIAL ADVISORS INC., <br><br> Plaintiff, <br><br> v. <br><br> MARY R. DeGON and MATTHEW M. BRUCE, <br><br> Defendants. | **AFFIDAVIT OF SUSAN LAMB** <br><br> Civil Action No. ____ <br><br> 04-10979 RGS |

I, Susan Lamb, do depose and state as follows:

1. I am a Field Vice President for American Express Financial Advisors, Inc. ("AEFA" or "American Express") and have been employed by or affiliated with AEFA for 20 years. I submit this declaration in support of Plaintiff's request for injunctive relief.

2. I am over 21 years of age. Except to the extent indicated, I make this affidavit on personal knowledge.

3. Plaintiff AEFA provides a variety of financial services to persons and entities nationwide (AEFA formerly was named IDS Financial Services Inc.). AEFA is a subsidiary of American Express Company.

4. According to AEFA's financial advisor records, Defendant Mary DeGon became sponsored by American Express on December 15, 1987 and subsequently was appointed an advisor for American Express on February 10, 1988. Before joining American Express, Ms. DeGon had no experience working in the financial services industry.

5. As with most new financial advisors, American Express provided Ms. DeGon with extensive training. American Express trained Ms. DeGon, at significant expense, by enrolling her in American Express' comprehensive training program, which included a two-week session at its training facility at Chaska, Minnesota. Thereafter, Ms. DeGon was assigned to work under the supervision of an experienced American Express Personal Financial Advisor. This training enabled Ms. DeGon to become an American Express financial advisor. During her initial training Ms. DeGon was a contractual employee of AEFA and after the completion of that training, Ms. DeGon became an independent contractor with AEFA.

6. According to AEFA's financial advisor records, on December 21, 1999, Ms. DeGon executed the American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement ("DeGon Franchise Agreement"). The DeGon Franchise Agreement provided that, upon AEFA's implementation of its new franchise program, Ms. DeGon would transform her affiliation with American Express from that of independent contractor to a franchiser. A copy of the American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement is attached as Exhibit A, and a copy of the signature page is attached as Exhibit B. Under the terms of the Franchise Agreement, Ms. DeGon was entitled to establish and operate an Independent Financial Advisor Business for AEFA. The Franchise Agreement contained a three (3) year term, subject to automatic renewal upon the satisfaction of certain designated conditions.

7. The DeGon Franchise Agreement further contained an Addendum 3-R (Rollout) Restrictive Covenant Addendum ("DeGon Addendum 3-R"), which Ms. DeGon also executed on December 21, 1999, a copy of which is attached as Exhibit C. According to DeGon

Addendum 3-R, American Express specifically agreed, upon Ms. DeGon's termination, to forbear from the enforcement of certain of its designated rights under the Franchise Agreement if Ms. DeGon satisfied certain conditions.

8. Throughout their affiliation, American Express assisted Ms. DeGon in developing and expanding her practice by providing her with American Express client accounts, client referrals and reassignments of American Express client accounts. American Express also made available to Ms. DeGon ongoing training and education, at American Express' expense, in investment planning methods and procedures and new and more sophisticated investment techniques. Moreover, throughout her affiliation with AEFA, Ms. DeGon has had numerous telephone and computer contacts with the American Express Corporate Office located in Minneapolis, Minnesota.

9. According to AEFA's financial advisor records, Defendant Matthew Bruce received a conditional offer of employment and sponsorship October 22, 1996, and subsequently was appointment as an advisor for American Express on or about March 12, 1997. Before joining American Express, Mr. Bruce had no experience working in the financial services industry.

10. Like Ms. DeGon and most new financial advisors, American Express provided Mr. Bruce with extensive training. American Express trained Mr. Bruce, at significant expense, by enrolling him in American Express' comprehensive training program, which included a two-week session at its training facility at Chaska, Minnesota. Thereafter, Mr. Bruce was assigned to work under the supervision of an experienced American Express Personal Financial Advisor. This training enabled Mr. Bruce to become an American Express financial advisor. During his

3

initial training Mr. Bruce was a contractual employee and he subsequently became an independent contractor with American Express.

11. After completing the training provided by American Express and receiving the appropriate licensing with American Express' assistance, Mr. Bruce changed his affiliation with American Express from an employee to an independent contractor.

12. According to AEFA's financial advisor records, on December 20, 1999, Mr. Bruce executed the American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement ("Bruce Franchise Agreement"). The Bruce Franchise Agreement provided that, upon AEFA's implementation of its new franchise program, Mr. Bruce would transform his affiliation with American Express from that of independent contractor to a franchiser. A copy of the signature page for the Bruce Franchise Agreement is attached as Exhibit D. Under the terms of the Franchise Agreement, Mr. Bruce was entitled to establish and operate an Independent Financial Advisor Business for AEFA. The Franchise Agreement contained a three (3) year term, subject to automatic renewal upon the satisfaction of certain designated conditions.

13. The Bruce Franchise Agreement further contained an Addendum 3-R (Rollout) Restrictive Covenant Addendum ("Bruce Addendum 3-R"), which Mr. Bruce also executed on December 20, 1999, a copy of which is attached as Exhibit E. According to the Bruce Addendum 3-R, American Express specifically agreed, upon Mr. Bruce's termination, to forbear from the enforcement of certain of its designated rights under the Franchise Agreement if Mr. Bruce satisfied certain conditions.

14. Throughout their affiliation, American Express assisted Mr. Bruce in developing and expanding his practice by providing him with American Express client accounts, client referrals and reassignments of American Express client accounts. American Express also made available to Mr. Bruce ongoing training and education, at American Express' expense, in investment planning methods and procedures and new and more sophisticated investment techniques. Moreover, throughout his affiliation with AEFA, Mr. Bruce has had numerous telephone and computer contacts with the American Express Corporate Office located in Minneapolis, Minnesota.

15. On March 22, 2000, American Express implemented its franchise program. On that same date, Mr. Bruce and Ms. DeGon entered into a business relationship and named it "DeGon and Bruce, a Financial Advisory Branch of American Express Financial Advisors."

16. Ms. DeGon and Mr. Bruce worked together as franchisers of American Express' Pembroke, Massachusetts office. They were the only registered financial advisors in that office.

17. As franchisers, American Express assisted Ms. DeGon and Mr. Bruce in developing and expanding their practice by providing them with American Express client accounts, client referrals and reassignments of American Express client accounts. American Express also made available ongoing training and education, at American Express' expense, in investment planning methods and procedures and new and more sophisticated investment techniques.

18. American Express authorized Ms. DeGon and Mr. Bruce, as franchisers, to use the AEFA and American Express trade names, marks, and logos. In the financial services field,

name recognition and identification with a strong, stable and well-known company have great importance and value.

19. American Express provided Ms. DeGon and Mr. Bruce with sales, research, and promotional support through American Express' network of financial professionals. By virtue of their affiliation with American Express, Ms. DeGon and Mr. Bruce also gained access to American Express' confidential books and records, including the identity, addresses, and account information of numerous American Express clients whose accounts they were assigned.

20. Through their affiliation with American Express as financial advisors, Ms. DeGon and Mr. Bruce worked one-on-one with American Express clients and were encouraged by American Express, as part of American Express' long-term strategy, to build valuable and lasting financial planning relationships with American Express clients. American Express trains its financial advisors to build valuable and lasting financial planning relationships with its clients and to document important information about each client, including their special needs and preferences and the important contact persons. These relationships benefit both American Express and its financial advisors.

21. American Express places a high value on the client relationships and goodwill with which its financial advisors are entrusted. Ms. DeGon and Mr. Bruce had long-term relationships with numerous American Express clients for whom they were the primary point of contact. Ms. DeGon and Mr. Bruce spent many years servicing these clients, getting to know them, and handling their various issues. Ms. DeGon and Mr. Bruce were, in fact, the very face of American Express since American Express does no direct marketing to its clients. Ms. DeGon's and Mr. Bruce's disregard for the non-competition agreement they each signed with

American Express places American Express at a serious disadvantage in continuing to service the clients previously entrusted to them.

22. As a result of the foregoing, and as a result of Ms. DeGon's and Mr. Bruce's efforts, for which American Express paid them, Ms. DeGon and Mr. Bruce became successful financial advisors. According to American Express' business records, as of March 31, 2004, Ms. DeGon had account responsibility for approximately three hundred and five (305) American Express client groups, representing approximately $38.7 million dollars of assets invested through American Express, and Mr. Bruce had account responsibility for approximately eighty seven (87) American Express client groups, representing approximately $7.7 million dollars of assets invested through American Express. American Express' records further established that in 2003, Ms. DeGon generated gross commissions, bonuses, and other compensation of more than $180,000 and Mr. Bruce generated gross commissions, bonuses, and other compensation of more than $92,000.

23. On or about March 23, 2004, I was informed by Ms. DeGon's and Mr. Bruce's compliance officer that they were intending on leaving AEFA. Shortly thereafter, I met with another AEFA advisor who told me he was in negotiations to purchase part of Ms. DeGon's and Mr. Bruce's practice. I discussed this information with him and told him that, in accordance with AEFA's practices, he would need to obtain permission from AEFA.

24. On or about March 25, 2004, I scheduled a meeting with Ms. DeGon and Mr. Bruce. At that meeting, they informed me that they were planning on terminating their affiliation with American Express. Due to the volume of assets under their control, I did not

want Ms. DeGon and Mr. Bruce to leave American Express. Accordingly, I discussed what could be done to encourage them to stay with American Express.

25.  Over the next several weeks, AEFA's Group Vice President, Larry Post, and I conversed with Ms. DeGon and Mr. Bruce on several occasions to discuss their future plans.

26.  Subsequently, Ms. DeGon and Mr. Bruce sent an email to Larry Post on April 12, 2004, stating that they had decided that they would leave American Express and that we could not convince them to stay.

27.  After learning that Ms. DeGon planned to leave, I spoke with her and advised her that she could qualify for the Addendum 3R provisions which would allow her to compete with AEFA within two weeks after terminating her affiliation. I explained to Ms. DeGon that she needed to comply with all the provisions of Addendum 3R, including the need to provide 2 weeks written notice of the termination to both Larry Post and to AEFA's Corporate Office. Ms. DeGon told me that she felt she had complied because she had submitted a request to sell her practice to another advisor. I told Ms. DeGon that a notice of an intent to sell her practice was insufficient as she needed to follow the specific requirements in the Addendum 3R.

28.  That same week, I confirmed with both AEFA Corporate Office and Larry Post that we had not received a written letter of termination from either Ms. DeGon or Mr. Bruce.

29.  In the evening of April 26, 2004, Ms. DeGon came to my office and handed me a letter of resignation. The letter had been back dated to April 5, 2004, and stated that her last day would be April 19, 2004, one week earlier.

30.  It is my understanding that both Ms. DeGon and Mr. Bruce subsequently sent copies of their letter of resignation to AEFA's Corporate Office, by facsimile, on May 3, 2004,

copies of which are attached as Exhibit F. Both Ms. DeGon's and Mr. Bruce's affiliation with AEFA were subsequently terminated.

31. I did not hear from Ms. DeGon again until I received an email from her on May 11, 2004, in which she stated that she had been "shut down from" AEFA's Online Service and Transaction program and could not gain access to AEFA's computer system. She inquired whether she should call in, or have someone else take care of "some things that need to be done." A copy of the email is attached hereto as Exhibit G.

32. Through internal investigations that have occurred since Ms. DeGon's and Mr. Bruce's affiliations were terminated, American Express has learned that they are:

(a) continuing to represent themselves, and hold themselves out as a franchisee of American Express;

(b) continuing to use American Express' Proprietary Marks;

(c) continuing to use American Express' signs and advertising materials;

(d) continuing to use American Express' Confidential Information, confidential methods, procedures, and techniques;

(e) using the telephone number and facsimile number used in the Independent Financial Advisor Business while affiliated with American Express; and

(f) continuing to use American Express' computer software and failing to erase, destroy, or remove such software from their computers.

33. In addition, it is my understanding that both Ms. DeGon and Mr. Bruce have refused to return any client records and that Ms. DeGon and Mr. Bruce have contacted American Express clients for the purpose of soliciting those American Express clients to

terminate their accounts with American Express and continue working with Ms. DeGon and Mr. Bruce.

34.    American Express treats information regarding its clients and services, including but not limited to client names, addresses, and data, including suitability information, investments and investment history, financial plans, and financial goal information, prospective client names, addresses, and data, and know-how concerning the methods of operation of the System and the business franchised client lists and other financial information as confidential and trade secret. American Express derives economic value from this information, as it is not being generally known to other persons or entities in the financial services industry, and takes steps to protect the information from being disclosed. Specifically, American Express requires that all its franchisers protect its confidential information and trade secrets by password protecting access to the franchiser's computer, maintaining security measures to control access to the franchiser's office, and prohibiting the general distribution of the information.

35.    As a result of Ms. DeGon's and Mr. Bruce's affiliation with American Express, American Express made certain confidential client and company information available to Ms. DeGon and Mr. Bruce to use in connection with their responsibilities as American Express financial advisors.

36.    The nature of the confidential American Express client information available to Ms. DeGon and Mr. Bruce to use in connection with their responsibilities as American Express financial advisors include, but is not limited to, the following: client personal information, dates of birth, financial information, social security numbers, children, assets, liabilities, employment,

and employment benefits. Not only is this information confidential pursuant to American Express policy, but it is confidential pursuant to government regulations as well.

37.  The nature of American Express confidential and proprietary company information available to Ms. DeGon and Mr. Bruce to use in connection with their responsibilities as American Express financial advisors include the following: American Express client lists, client contact information, client account numbers, yearly and quarterly client statements reflecting the value and activity of accounts, and client meeting notes and correspondence confirming those meetings. This type of information is proprietary in part because it is developed at a cost to American Express, and is the type of information that if it were readily available to competitors it would place American Express in a competitive disadvantage.

38.  It is my understanding that the NASD website states that Ms. DeGon and Mr. Bruce became affiliated members of ING on May 4, 2004.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, THIS 14TH DAY OF MAY, 2004.

*Susan Lamb*

Susan Lamb