UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2004 MAY 25  P 12: 27

U.S. DISTRICT COURT
DISTRICT OF MASS.

)
AMERICAN EXPRESS FINANCIAL ADVISORS, )
INC., )
)
                Plaintiffs, )
) Civil Action No. 04-10979 RGS
v. )
)
MARY R. DeGON and MATTHEW M. BRUCE, )
)
                Defendants. )
)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

Defendants Mary R. DeGon ("DeGon") and Matthew M. Bruce ("Bruce") (collectively, "Defendants") respectfully submit this Memorandum of Law in opposition to the motion of plaintiff American Express Financial Advisors Inc. ("AEFA" or "Plaintiff") for a preliminary injunction impairing their ability to provide financial services to their customers. Plaintiff's motion should be denied and this proceeding stayed in favor of expedited arbitration before the National Association of Securities Dealers, Inc. ("NASD").[1]

---

[1]     Defendants rely on the Declaration of Anthony Paduano, dated May 21, 2004 ("Paduano Dec."). In addition, submitted herewith as Appendix A are 102 arbitration decisions rendered over the past twenty years in which brokerage firms have made essentially identical claims to those made by AEFA here and injunctive relief was emphatically denied in favor of damages awards. A collection of 116 decisions in which courts have rejected requests for injunctive relief against brokers is submitted herewith as Appendix B.

## Preliminary Statement

Defendants are financial advisors, who formerly were AEFA franchisees. The entire basis of this action is the baseless allegation that Defendants have breached the restictive covenants contained in their Franchise Agreement with AEFA. However, that same agreement contains an addendum -- Addendum 3-R -- that makes clear that the restrictive covenant is not applicable in the event that certain conditions are met.[2] AEFA has attempted to manufacture a dispute with Defendants, by alleging that the conditions in Addendum 3-R have not been met, in order to improperly take Defendants' clients, to which AEFA has no legal entitlement. Specifically, AEFA disingenuously argues that Defendants did not provide AEFA with two-weeks <u>written</u> notice of their resignation. In fact, as set forth in detail in Defendants' Declarations, submitted herewith, Defendants gave notice of their resignation to AEFA on March 23, 2004 (as AEFA concedes, albeit not in writing at that time) and attempted to terminate their affiliation with AEFA as of April 19, 2004. Thereafter, on April 5, 2004 -- two weeks before their resignations were to become effective -- Defendants submitted all necessary written documentation to AEFA in connection with the termination of their affiliation. Subsequently, on April 12, 2004 -- one week before their resignations were to become effective -- DeGon e-mailed a letter to AEFA confirming their intended resignation as of April 19. Thus, for AEFA to now argue to the Court that Addendum 3-R is not applicable because Defendants did not provide the required two-weeks written notice demonstrates the utter lack of merit to this Action.

AEFA also asserts that Addendum 3-R is not applicable because Defendants continue to use AEFA signs, and Defendants solicited their clients prior to the effective date of their termination (i.e., April 19, 2004). As set forth in Defendants' Declarations, however, Defendants

---

[2] A copy of Addendum 3-R, signed by AEFA for each Defendant, is annexed to the Declaration of Mary DeGon ("DeGon Dec.") as Exhibit 4 and the Declaration of Matthew Bruce as Exhibit 3.

have complied with each and every condition set forth in Addendum 3-R. Indeed, AEFA has not named a single client that was purportedly notified by Defendants prior to their resignation.

AEFA's request for injunctive relief should also be denied because AEFA comes before the Court with unclean hands. On March 23, 2004, Plaintiffs notified AEFA both of their intention to resign, and to sell their client books to another AEFA financial advisor. Indeed, the Affidavit of Susan Lamb, submitted in support of AEFA's request, acknowledges that AEFA knew of Defendants' desire to sell their books of business. See Lamb Aff. ¶ 23. Under the Franchise Agreement, AEFA agreed that it would "not unreasonably withhold its consent" to Defendants' sale of their client books. See DeGon Dec. Exhibit 1. Under the Franchise Agreement, AEFA also had the right to purchase Defendants' books of business, on the same terms as conditions that Defendants had agreed with another AEFA financial advisor. However, AEFA neither agreed to purchase Defendants' books of business, nor approved of Defendants' sale. Instead, AEFA has set on a course to take Defendants' client businesses without paying for them. Accordingly, AEFA has acted in bad faith. Indeed, AEFA, initially approved Defendants' sale of their client books to another financial advisor on May 3, 2004. In reliance on such approval, Defendants' authorized ING to transfer their securities licenses from AEFA to ING, which occured on May 4, 2004. However, on May 6, 2004, AEFA withdrew its approval without offering any reason. See DeGon Dec. ¶¶ 16 & 18. Such withdrawal of approval was unreasonable, and violated Section 14 of the Franchise Agreement. See DeGon Dec. Exhibit 1.

The overwhelming authority developed in scores of virtually identical disputes brought by brokerage houses against former employees demonstrates that:

> (a) Plaintiffs are not irreparably harmed when financial advisors join a competitor, even if they (as they almost always do) retain copies of their customer holding pages and account statements;
>
> (b) Plaintiffs are not likely to succeed on the merits of their claims for injunctive relief, which claims have been rejected by an overwhelming majority of the industry arbitration panels that have assessed its contract and tort claims in essentially identical cases;

 (c) securities industry arbitration panels have no difficulty assessing (or denying) damages in cases where financial services firms have sought injunctive relief and damages for acts identical to those stated in the Complaint; and

 (d) the public interest overwhelmingly is not served by, and the balance of the equities does not support, entry of an injunction that restrict Defendants from soliciting and servicing the public customers who have come to rely upon them in making investment and other financial decisions, or deny Defendants access to the documents and information necessary to properly advise those clients who choose to continue their business relationships with Defendants.

Moreover, this Court should deny the injunction because the true victims here -- the investing public -- will be artificially separated from their financial advisors of choice. Defendants' customers who wish to exercise their rights to continue to be served by Defendants should be allowed to do so.

Plaintiff's claim that the identities of Defendants' customers constitute its "confidential information" is simply false. Virtually of all of Defendants' customers were developed by them, at their expense, and without any assistance from Plaintiffs. Under the instant facts, Plaintiff's allegation that Defendants' client information is somehow its property has no basis in fact or law. Massachusetts courts -- and courts throughout the country -- that have closely examined AEFA's prior claims for injunctive relief have rejected applications similar to the instant one. See, e.g., American Express Financial Advisors, Inc. v. Williams, No. 98-2398C (Mass. Super. Ct. November 10, 1998) (Appendix B, Tab 85); American Express Financial Advisors, Inc. v. O'Brien, No. 95-1249(Mass. Super. Ct. June 23, 1995) (Appendix B, Tab 65); American Express Financial Advisors, Inc., et ano. v. Temm, et al., 241 F. Supp. 2d 30 (D. Me. 2003) (Appendix B, Tab 116); American Express Financial Advisors, Inc. v. Butt, et ano., Case No. 3:03-CV-509-S (D. Ky. Aug. 28, 2003) (Appendix B, Tab 113); American Express Financial Advisors, Inc. v. Botwinick, et al., Civil Action No. 98-4552 (NHP) (D. N.J. Oct. 21, 1998) (Appendix B, Tab 84); American Express Financial Advisors, Inc. v. Conoway, Index No.

8486/98 (N.Y. Sup. Ct. Aug. 18, 1998) (Appendix B, Tab 83); <u>American Express Financial Advisors, Inc. v. Lanpher</u>, Index No. 7578/98 (N.Y. Sup. Ct. July 24, 1998) (Appendix B, Tab 82); <u>American Express Financial Advisors, Inc. v. Welch</u>, Case No. 96-2792 (Fla. Cir. Ct. June 18, 1996) (Appendix B, Tab 76).

To the extent that clients desire to exercise their rights to transfer their accounts out of AEFA, Defendants' clients are entitled to be serviced by Defendants because NASD Uniform Practice Code Section 11870 and NYSE Rule 412 specifically state that, upon the customer's request, a brokerage firm must transfer the records of a customer who wishes to be serviced by another brokerage house. <u>See</u> Paduano Dec. <u>Exhs. 4 and 5</u>. Section 11870(a) of the NASD Uniform Practice Code requires that, when a customer of one NASD member firm (the "carrying member") "wishes to transfer the entire account(s) to another member (the "receiving member") and gives written notice of that fact to the receiving member, <u>both members must expedite and coordinate activities with respect to the transfer</u>." (Emphasis added). Further, Section 11870(b)(1) states that upon receipt of written transfer instructions from a customer, "the receiving member <u>must</u> immediately submit such instructions to the carrying member." (Emphasis added). In the absence of one of the enumerated exceptions[3] -- none of which generally apply here -- the carrying member (AEFA, in this case) "<u>must</u> transfer the securities positions and/or money balance reflected on its books for the account." (Emphasis added.)

The NASD has reaffirmed its rules that prohibit any NASD member firm such as AEFA from taking any action that interferes with a customer's right to transfer his or her account. <u>See</u> Paduano Dec. <u>Exh. 6</u>). The North American Securities Administrators Association has issued its own statement opposing any action by financial services firms that would interfere with a customer's right to do business with the financial advisor and/or firm of his or her choice, and threatening those that do with disciplinary actions and/or fines. (<u>See</u> Paduano Dec. <u>Exh. 10</u>).

---

[3] The exceptions to the mandatory transfer of accounts set forth in Section 11870(d)(3) concern instances where the account has no assets, in which further documentation or information is necessary, in which the firms' information does not match, where the transfer violates a credit policy, and other technical (and for these purposes, irrelevant) issues.

As demonstrated below, on the facts disclosed by the record herein, the injunction should be denied and this action should be stayed pending an expedited arbitration before the NASD.

### Factual Background

The factual background is set forth in the accompanying Declarations of Defendants, and not repeated herein.

### ARGUMENT

#### Point I
#### PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF SHOULD BE DENIED BECAUSE IT CANNOT SATISFY THE STRINGENT REQUIREMENTS FOR OBTAINING SUCH EXTRAORDINARY RELIEF

This Court should deny Plaintiff's application for an injunction because Plaintiff cannot overcome the strong presumption against granting such extraordinary relief. To obtain an injunction, Plaintiff must establish (1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) that injunctive relief will not harm the public interest. Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999). Failure on even one point proves fatal to a request for a preliminary injunction. IKON Office Solutions, Inc., 59 F. Supp. 2d at 128. A preliminary injunction "is a drastic and extraordinary remedy that is not to be routinely granted." Holmes Products Corp. v. Catalina Lighting, Inc., 67 F. Supp. 2d 10, 12 (D. Mass. 1999).

Massachusetts law should apply to the instant action, despite the choice-of-law clause contained in the Franchise Agreements, because, as set forth further below, there is a "serious conflict with the public policy of Massachusetts," and because there is no "substantial relation" between these agreements and Minnesota. John T. Callahan & Sons, Inc. v. Dykeman Elec. Co., 266 F. Supp. 2d 208, 231 (D. Mass. 2003). See also Dykes v. Depuy, Inc., 140 F.3d 31, 39 (1st Cir. 1998) (same). In the instant action, there is no relationship between the Franchise Agreements at issue and Minnesota. Defendants reside in Massachusetts and were affiliated with Plaintiff in Massachusetts until their resignations. Moreover, the Franchise Agreements were

presented to Defendants and executed by Defendants in Massachusetts. Defendants have no clients who reside in Minnesota. Accordingly, the laws of Massachusetts should apply.[4]

Massachusetts has a strong public policy in favor of an employee's right to freely pursue his or her profession. In Routhier Placement Specialists, Inc. v. Brown, 2002 WL 31248032 (Mass. Super. Sept. 26, 2002), the Superior Court of Massachusetts stated "[w]hile covenants not to compete may be enforced in limited circumstances to protect the legitimate business interests of the employer, they are not favored and may not be used to restrain free competition or to deprive the employee of the opportunity to use acquired skills and knowledge to secure other employment." Id., 2002 WL 31248032 at *1 (citations omitted). The court further stated that "[t]he reason for this rule is based on sound public policy considerations. There is a public policy in favor of every person carrying on his trade or occupation freely." Id. (citing Woolley's Laundry v. Silva, 304 Mass. 383, 23 N.E.2d 899, 900 (Mass. 1939) (stating that "[i]nterference with individual liberty of trade, if there is nothing more, is contrary to public policy"). Another important Massachusetts public policy is the right of customers to choose their financial advisors. In Merrill Lynch, Pierce, Fenner & Smith v. Cuppels, No. 95-0036 (Mass. Super. Ct., January 10, 1995) (Houston, J.) (Appendix B, Tab 60), the court, in denying Merrill Lynch's request for a preliminary injunction, stated that "[a] non-competition agreement may obstruct

---

[4] This notwithstanding, if Minnesota law did apply to this dispute, the outcome would be the same. Minnesota law considers non-compete agreements to be a restraint on trade and as such non-compete agreements are disfavored. See e.g., IKON Office Solutions, Inc. v. Dale, No. CIV 01-286 DSD/SRN, 2001 WL 391587 *896 (D. Minn. 2001) ("Restrictive covenants that limit one's right to work and earn a livelihood are generally disfavored by courts since they restrain free trade."); Freeman v. Duluth Clinic, Ltd., 334 N.W.2d 626, 630 (Minn. 1983) (holding that "[t]he mere continuation of employment can be used to uphold coercive agreements, but the covenant must be bargained for and provide the employee with real advantages." 334 N.W.2d at 630. Here, Defendant DeGon became affiliated with AEFA in 1987, and Defendant Bruce became affiliated with AEFA in 1996. AEFA unilaterally changed its relationship with Defendants to that of franchisor-franchisee in 1999, and required Defendants to sign additional non-competition agreements. AEFA cannot argue that the restrictive covenants it seeks to enforce were "bargained for" by Defendants. Moreover, Defendants continued to build their business on their own, as they had before As such, under Minnesota law, the non-competition agreement would be unenforceable.

public policy if the agreement interferes with the public's right to choose professional services. Massachusetts recognizes the importance of allowing members of the public to freely choose their professional advisors." Id., slip op. at 4-5.

In IKON Office Solutions, Inc. v. Belanger, 59 F. Supp. 2d 125 (D. Mass. 1999) (Neiman, J.), this Court stated that "non-competition agreements are enforceable to the extent that they are reasonable and necessary to protect the employer's legitimate interests while not interfering with ordinary competition." Id., 59 F. Supp. 2d at 128. The Court further stated that a plaintiff must prove the restrictive covenant " (1) is necessary to protect the legitimate business interests of the employer, (2) is supported by consideration, (3) is reasonably limited in all circumstances, including time and space, and (4) is otherwise consonant with public policy." Id.

A restrictive covenant for personal services will only be enforced to the extent that is reasonable in time and geographic area, necessary to protect the legitimate interests of the employer and not an obstruction of the public interest. Alexander & Alexander v. Danahy, 21 Mass. App. Ct. 488, 498, 488 N.E.2d 22, 29 (1986). However, "[p]rotection of the employer from ordinary competition . . . is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced." Marine Contractors Co. v. Hurley, 365 Mass. 280, 287-88, 310 N.E.2d 915, 920 (Mass. 1974). In addition, in making its determination whether or not to issue an injunction, the court must weigh the reasonable needs of the former employer for protection against both the reasonableness of the restraint imposed on the former employee and the public interest. All Stainless, Inc. v. Colby, 364 Mass. 773, 778, 308 N.E.2d 481, 485 (1974).

Because non-compete agreements by their nature restrain trade, they are not analyzed as ordinary commercial contracts; courts are required to balance the reasonable needs of the former employer for protection against harmful conduct, the reasonableness of the restraint, and the public interest. All Stainless, Inc. v. Colby, 364 Mass. 773, 778, 308 N.E.2d 481, 485 (1974). Thus, restrictive covenants may not be broader than necessary to protect legitimate business interests. New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 674, 363 N.E.2d 526, 528

(1977). The balancing test -- which departs from a strict freedom of contract analysis -- is rooted in the basic principle that a party may not attempt to use a restrictive covenant to "protect itself from ordinary competition." New England Canteen, 372 Mass. at 676, 363 N.E.2d at 529. Thus, AEFA's interest in disabling its competitors is not a valid protectable interest. See New England Canteen, 372 Mass. at 676, 363 N.E.2d at 529; Richmond Bros., Inc. v. Westinghouse Broadcasting Co., 357 Mass. 106, 111 (1970).

The party seeking to enforce a restrictive covenant bears the burden of demonstrating that it seeks to protect a legitimate business interest. New England Canteen, 372 Mass. at 675, 363 N.E.2d at 529. AEFA has no "legitimate business interest" at stake regarding the financial affairs of individuals who choose to elect to do their business with someone other than AEFA. AEFA has articulated no cognizable interest it has in preventing Defendants from working on behalf of the customers who depend on them. Protectable interests fall into three categories: trade secrets, confidential information and goodwill. New England Canteen, 372 Mass. at 674, 363 N.E.2d at 528. AEFA has failed to demonstrate the existence of any of these interests.

The Massachusetts Supreme Judicial Court has recognized that in certain situations "whatever goodwill exists (was) generated by the defendant." New England Canteen, 372 Mass. at 673, 363 N.E.2d at 528. Because it was the defendant who had built up the goodwill with his customers, the Supreme Judicial Court affirmed the lower court's finding that the former employer had no goodwill interest to legitimately protect with a non-compete agreement. Id., 372 Mass. at 673, 363 N.E.2d at 528. Moreover, when the goodwill in issue belongs to the party who is subject to the restrictive covenant, such as Defendants, the party seeking to enforce the covenant, such as AEFA, has no protectable interest warranting an injunction. Sentry Ins. v. Firnstein, 14 Mass. App. Ct. 706, 708, 442 N.E.2d 46, 47 (1982); New England Canteen, 372 Mass. at 673, 363 N.E.2d at 528. The ownership of a particular client's goodwill may turn upon that client's view of the relationship and what makes it persist. See Sentry Ins., 14 Mass. App. Ct. 706, 707-08, 442 N.E.2d at 47.

### A.  Plaintiff Cannot Demonstrate That It Will Suffer Irreparable Harm

At the very basic level, injunctive relief is not warranted here because Plaintiff cannot demonstrate that it will be irreparably harmed, since expedited arbitration before the NASD can determine and adequately resolve all its claims. Courts have recognized that where an expedited arbitration has been commenced, there is no reason to grant a brokerage firm any relief in court. See e.g., American Express Financial Advisors, Inc. v. Suzanne Osborne, Civil Action No. 7:01CV00949 (D. Va. Dec. 19, 2001) (Turk, J.) (holding that "any harm [AEFA] suffers can be remedied by the [NASD] arbitration panel."). See Paduano Dec. Exh. 2.

Moreover, any injury suffered by Plaintiff due to any actions allegedly taken by Defendants, if proved, will be easily compensable by an award of money damages. Every dollar earned by Defendants doing business with those customers Plaintiff considers its own can be traced precisely. Any future business Plaintiff might have earned as a result of Defendants' work is knowable to the penny. Hence, injunctive relief is not permissible.

The United States Supreme Court has repeatedly held that where money damages provide an adequate remedy, irreparable harm cannot be found:

> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury .... 'The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.' (emphasis in original).

Sampson v. Murray, 415 U.S. 61, 90 (1964) (quoting Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. 1958)). If the loss is compensable by money, injunctive relief is improper. See Merrill Lynch v. Newton & Hazlett, Case No. 92-1961 (S.D. Fla. 1992) (denying preliminary injunction against a broker because the former firm "is unable to show that it lacks an adequate remedy at law or that its injury, if any, cannot be compensated by money damages.") (Appendix B, Tab 38).

Similarly, in <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop</u>, 839 F. Supp. 68 (D. Me. 1993), Chief Judge Carter rejected identical claims of irreparable harm, noting that "the best reasoned cases have clearly held that the difficulty of determining the amount of such an award does not impugn the <u>adequacy</u> of the damages remedy at law." <u>Id</u>. at 74. (Emphasis added.) Here, as in <u>Bishop</u>, AEFA has presented the court with:

> rather precise figures as to how many accounts Defendant was exposed to during his employment, the amount of assets represented by these accounts, and the precise dollar amounts of commissions generated annually by these accounts. These figures, at the least, set out discernible parameters for discovery as to the extent of damage incurred by Merrill Lynch on account of Defendant's alleged misconduct.

839 F. Supp. at 74 n.5.

This rule was recognized by the Massachusetts Superior Court in <u>American Express Financial Advisors, Inc. v. Williams</u>, No. 98-2398C (Mass. Super. Ct. November 10, 1998) (Appendix B, Tab 85), in which the court denied injunctive relief to AEFA. The court found that "any loss or harm sustained by AEFA as a result of any breach of the Agreement by [the former financial advisor] . . . may be adequately redressed by money damages." <u>Id</u>., slip op. at 5. Similarly, in <u>American Express Financial Advisors, Inc. v. O'Brien</u>, No. 95-1249(Mass. Super. Ct. June 23, 1995) (Appendix B, Tab 65), the court stated that "[a]lthough issuance of an injunction would not bar the defendant from conducting his financial planning business, it could harm [the defendant], as a single financial advisor, far more than the risk of harm which a denial of the injunction could have on [AEFA's] billion-dollar business." <u>Id</u>., slip op. at 5-6. In <u>Merrill Lynch, Pierce, Fenner & Smith v. Cuppels</u>, No. 95-0036, (Mass. Super. Ct., January 10, 1995) (Houston, J.) (Appendix B, Tab 60), the court stated that "[t]o restrain defendant restrains the clients involved. The clients are not parties to this action and the free choice of clients to follow defendant or remain at Merrill Lynch should not be interfered with by this court. <u>Id</u>., slip op. at 4-5. See also <u>Merrill Lynch, Pierce, Fenner & Smith v. Bennert</u>, 980 F. Supp. 73, 76 (D. Me. 1997).

### B.     Plaintiff Cannot Demonstrate A Likelihood Of Success On The Merits

Plaintiff cannot prevail on the merits because it cannot demonstrate that Defendants have breached the conditions set forth in Addendum 3-R. As long as the Addendum controls, the restrictive covenant is not in effect.

Moreover, Plaintiff's request for an injunction must ultimately be decided, not by a court, but rather by securities industry arbitrators following well-established industry-specific principles of arbitral decision. See, e.g., Dean Witter Reynolds, Inc. v. Imperatore & Furze, Docket No. C-32-97E (N.J. Sup. Ct. Bergen Co. February 14, 1997) (Appendix B, Tab 79) (denying injunctive relief and stating: "It seems to me that the greater experience and knowledge of the arbitration tribunal dictates that if at all possible that is the tribunal that should be called upon to deal with this matter. I find that Plaintiff has not demonstrated a likelihood of success on the merits.").

#### 1.     Arbitrators Overwhelmingly Deny Requests for Permanent Injunctive Relief

It is common knowledge that securities industry arbitrators almost universally refuse to issue injunctions such as Plaintiff seeks here. The 102 arbitration decisions included in Appendix A concern cases in which brokerage firms have made essentially identical claims to those made by Plaintiff here and injunctive relief was emphatically denied in favor of damages awards. Similarly, the 116 decisions included in Appendix B demonstrate that courts have similarly rejected injunctive relief against brokers.

In American Express Financial Advisors, Inc. v. Suzanne Osborne, NASD No. 01-06713 (Paduano Dec. Exh. 3), the panel denied AEFA's demand for injunctive relief and awarded the respondent financial advisor $100,000 in damages against AEFA for tortiously interfering with her relationship with her clients, and ordered AEFA to pay all forum fees associated with the hearings. See American Express Financial Advisors, Inc. v. Suzanne Osborne, NASD No. 01-06713 (See Paduano Dec. Exh. 3). In American Express Financial Advisors, Inc. v. VonLange

(NASD May 15, 1998) (Appendix A, Tab 82), a single arbitrator rejected every attempt by American Express to restrict its former brokers from working with their clients and using documents concerning their clients. See also Dean Witter v. Zielke (NASD January 8, 1997) (Appendix A, Tab 83); Raymond James & Assocs., Inc. v. Prudential Securities Inc., et al. (NASD December 24, 1998) (Appendix A, Tab 84).

The panels in these and in the other proceedings included in Appendix A demonstrate that there is neither irreparable harm nor a likelihood of success on the merits after a full hearing before the arbitrators. Many courts faced with a situation similar to the present have expressly rejected the identical arguments made by AEFA here, including the cases collected in Appendix B.

### 2. Plaintiff Is Unlikely To Succeed In Its Attempts To Prevent Defendants From Continuing To Do Business With The Clients They Developed

Plaintiff alleges that Defendants have misappropriated their trade secrets by taking with them lists of their own customers. No authority, however, supports Plaintiff's proposition that information pertaining to investors "belongs" to any member firm. In fact, the industry regards customer records as belonging to the customer. In particular, under the Rules of both the NYSE and the NASD, a customer is always free to direct a brokerage firm to transfer his or her account and related records to another firm. See NASD Uniform Practice Rule 11870 and NYSE Rule 412 (Paduano Dec. Exhs. 4 and 5).

The practice in the industry also indicates that AEFA does not have a protectable interest in the customer lists at issue. The undisputed record shows that all brokerage firms recruit from each other and encourage their newly-hired brokers to solicit customers they formerly serviced.[5] In such circumstances, client information can hardly rise to the level of a protectable interest.

---

[5] In assessing such claims, Massachusetts courts have applied what is commonly known as the "rascality" test: would the conduct "raise the eyebrow of someone inured to the rough and tumble world of commerce." Franklin v. Ciroli, 865 F. Supp. 940, 946 n.18 (D. Mass. 1994) (quoting Levings v. Forbes & Wallace, 8 Mass. App. Ct 498, 503-504, 396 N.E.2d 149 (1979) (citations and quotations omitted). In the present case, AEFA fails to offer any evidence that Defendants engaged in any such conduct. Instead, the record is clear that Defendants behaved in accordance with industry standards.

Since industry practice dictates that customer lists are not proprietary or confidential, there is no protectable interest on the part of AEFA. Nor does the industry recognize that documents pertaining to Defendants' clients contain AEFA "confidential information." The 102 arbitration decisions contained in the accompanying Appendix A demonstrate that the weight of expert industry authority rejects such claims when made by brokerage firms with respect to a financial consultant's own client records and information.

If the information at issue is in any way confidential, it is confidential to the clients and not to AEFA. Not surprisingly, brokers' clients have repeatedly volunteered to courts and arbitration panels that they regard their account records as their records, not those of their brokerage firm, and that they expect their brokers to retain copies of these records when they change firms. See Merrill Lynch, Pierce, Fenner & Smith v. E.F. Hutton & Co., 403 F. Supp. 336, 341 (E.D. Mich. 1975) ("the customers preferences . . . cast doubt upon [Merrill Lynch's] proprietary claim to the copies of the [customer records]"). As noted above, both the NYSE and NASD rules are in accord.

In Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 620, 405 N.E.2d 106, 113 (Mass. 1980), the Supreme Judicial Court of Massachusetts held that vendor lists were not necessarily trade secrets in situations where the accounts were customers of the defendant prior to his employment with the plaintiff.

### C. Plaintiff Cannot Demonstrate That The Balance of Equities Tips In Its Favor

If this Court enjoins Defendants from doing business with their clients it will destroy the careers that they have worked so hard to build. It may also cripple them financially and perhaps hinder their ability to support their families. On the other hand, the most Plaintiff stands to lose is an amount of money that is infinitesimally small relative to its size.

In denying a similar application by Smith Barney for injunctive relief, the Court in Smith Barney v. Cappiello stated:
> In balancing the equities the court finds the harm petitioner will sustain by denying injunctive relief until it can seek expedited relief under [NASD] Rule 10335(d) is not commensurate with that which respondent will

> sustain by the imposition of an injunction pending resolution of the arbitration.

See also Morgan Stanley Dean Witter v. Johnson, Civil Action No. 99-4548-G (Mass. Super. Ct. September 28, 1999) (denying preliminary injunction against a broker and stating that "issuance of an injunction would not bar Dean Witter from conducting its financial planning business, while it could harm [the broker] severely by restricting his ability to make a living").

In Grease Monkey International, Inc. v. Ralco Lubrication Services, Inc., 24 F. Supp. 2d 120 (D. Mass. 1998) (Lasker, J.), this Court denied a preliminary injunction in a similar situation. The Court held that if the plaintiff ultimately prevailed on the merits any loss could be compensated through a monetary award, while granting an injunction would terminate the defendant's livelihood. The Court in denying the preliminary injunction, reasoned that the balance of equities obviously tipped in defendant's favor since the defendant's "ability to earn a living in his chosen field would be extinguished or at least substantially curtailed if he were enjoined," while the plaintiff's alleged harm would be compensable. Grease Monkey, supra, 24 F. Supp. 2d at 125.

In Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 405 N.E.2d 106 (Mass. 1980), the Supreme Judicial Court of Massachusetts upheld the denial of a preliminary injunction against a corporation's former Vice President. The Court held that even if a court concludes that regarding at least certain of their claims the plaintiff is more likely to prevail than defendant, this conclusion alone would not require that court to issue an injunction. It is the combination of likelihood of success and degree of irreparable injury that matters. When the granting of a preliminary injunction would most seriously disrupt and probably wipe out defendant's business, while plaintiff's established structure should be able to weather the feeble assault upon it pending the outcome of litigation without serious damage, the court must deny the request for a preliminary injunction. Packaging Industries Group, 380 Mass. at 622, 405 N.E.2d at 114. See also Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999) (affirming denial of injunctive relief sought by former employer where employee was required to sign form agreement or forfeit employment); Safety-Kleen Sys., Inc. v. McGinn, 233 F. Supp. 121, 124 (D.

Mass. 2002) (Lasker, J.) (denying former employer's request for injunctive relief); Flexcon Co. v. McSherry, 123 F. Supp. 2d 42, 44 (D. Mass. 2000) (Gorton, J.) (denying former employer's request for injunctive relief where restrictive covenant was presented to employee as "routine paperwork"). In IKON Office Solutions, Inc. v. Belanger, 59 F. Supp. 2d 125 (D. Mass. 1999) (Neiman, J.), the court denied injunctive relief to a former employer, and noted that continued employment, in and of itself, is insufficient consideration to support a post-employment restrictive covenant. Id., 59 F. Supp. 2d at 131. The court further noted that "some evidence that the terms of the underlying employment contract had been negotiated" is necessary to enforce a post-employment restrictive covenant. Id.

In Halpert, Oberst & Co. v. Einsbruch, No. C-3401-87E, transcript at 12 (N.J. Ch. Div. May 6, 1987), the court recognized the absence of immediate or irreparable harm, as well as the relative equities between the parties:

> As between the parties, I think that entering an injunction at this time, if proved to be wrong, would be more detrimental to [the registered representative] as an individual employee as against the weight of a much larger company who I am sure would adequately survive the crisis of [his departure] whether or not they get everything they are entitled to. Let's face it, that we are not dealing with comparative equities in the case.

Similarly, in J.B. Hanauer v. Stuart Katz, Docket No. C-4345-87 (N.J. Ch. Div. May 7, 1987), the court also realized that brokerage firms can survive the denial of an injunction far more readily than their departing representatives could survive its issuance:

> Certainly, there is more to lose here, in a balancing of equities, by the Defendant by the grant of injunctive relief than there is by the Plaintiff who can be redressed if successful. The Plaintiff can continue to run its business and seek to hold the Defendant or the Defendants as the case may be, since there are malicious interference claims here also, or, as I were to grant an injunction, I would in essence be putting the Defendant out of business.

J.B. Hanauer v. Stuart Katz, Docket No. C-4345-87 (N.J. Ch. Div. May 7, 1987).

Since Defendants' ability to earn a livelihood in their chosen field would be substantially curtailed if the Court issued an injunction, Plaintiff's demand for preliminary injunctive relief should be denied.

### D. Plaintiff Cannot Demonstrate That Issuance Of The Injunction It Seeks Serves The Public Interest

The public interest clearly favors Defendants and the public customers. Plaintiff's conclusory assertions to the contrary is not supported by a single fact and pointedly avoids any discussion of the public interest in being able to continue to do business with the brokers of their choice and in robust competition and flow of information in the securities industry.

The injunction sought here, far from serving the public interest, plainly harms it. Such an injunction disservices the public interest in two critical respects. First, with respect to the clients served by Defendants, it deprives them of valuable and trusted sources of information and advice about their investments, risks and alternatives. Secondly, all of the clients at issue will be forced to rely upon strangers who do not know them or their accounts. Courts should zealously guard the public's right to preserve special relationships of trust and confidence that particular clients form with their professional advisors. In short, an injunction would essentially deprive innocent third parties -- the clients -- of their freedom and right to do business with the brokers of their choice, their right to choose where and with whom to entrust their life savings, retirement funds, children's college accounts, etc. This would clearly and heavily disservice the public interest. This manifestly intolerable result in and of itself warrants denial of Plaintiff's application. Plaintiff's papers are completely silent regarding the rights of Defendants' clients. Yet the courts have recognized them. Thus, in Merrill Lynch, Pierce, Fenner & Smith v. Bramer, No. C 93-1820 (N.D. Cal. May 25, 1993), the Court rejected a similar application, stating:

> I think there is a grave concern about allowing a large institution to essentially try to supplant the relationship that clients have with their brokers. When you are looking at irreparable harm and public interest, certainly clients have as much an interest in this dispute that is going here as either of the parties. And I think the court has an obligation to look out for those people.

Accord Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Casellas, Civil No. 95-2020 (JAF) (D.P.R. Feb. 18, 1996); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McCullen, 1995 WL 799537, *2 (S.D. Fla. 1995).

As the New Jersey Superior Court has held, an injunction such as that sought here by Plaintiff "would prohibit the defendants from possibly using the client books which they have been servicing for some number of years. It would be contrary to public policy to prohibit the defendants from servicing clients that may consist of family and friends and/or customers solicited from cold calls." Gibraltar Securities Co. v. Hugo, Civil Action No. MRS-C-148-99 (N.J. Super. Court, September 24, 1999).

## Point II

### AEFA'S APPLICATION FOR INJUNCTIVE RELIEF IS BARRED BY THE DOCTRINE OF UNCLEAN HANDS

It is an ancient maxim that "[s]he who comes into equity must come with clean hands. . . [T]hus the doors of equity are closed to one tainted with inequitableness or bad faith relative to the matter in which [s]he seeks relief, however improper may have been the behavior of the other party." Fid. Mgmt. & Research Co. v. Ostrander, 40 Mass.App.Ct. 195, 200, 662 N.E.2d 699, 704 (Mass. App. Ct. 1996) (alteration in original). As set forth above, AEFA approved Defendants' sale of their client books to another financial advisor, and then, without reason, withdrew such approval, in violation of Section 14 of the Franchise Agreement. Having treated Defendants unfairly, AEFA now seek to further harm Defendants by seeking to enforce the Addendum without any evidence that Defendants have breached such Addendum. Indeed, Defendants have fully complied with the Addendum's requirements, thereby rendering its provision for injunctive relief inapplicable. AEFA's unfair treatment of Defendants should prohibit them from now seeking to further injure Defendants and their business.

### Conclusion

For the foregoing reasons, this Court should deny Plaintiff's motion for interim injunctive relief against Defendants and stay this action pending expedited arbitration before the NASD.

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request that oral argument be heard on Plaintiff's motion.

Dated: Weymouth, Massachusetts
May 25, 2004

        Respectfully submitted,

        BALDASSINI & BALDASSINI

        By: /s/ Jim Baldassini
        Jim Baldassini
        59 Winter Street  02188
        Weymouth, Massachusetts
        Attorney for Defendants Mary R. DeGon and
        Matthew M. Bruce